VANTONGEREN, Respondent, *v.* HEFFERNAN *et al.*, Appellants.

**1. Public Lands—Pre-emptioner's Rights before Patent.**

> A pre-emptioner of public land, with the usual final receipt, has no such title, prior to the issuance of the patent, as will enable him to maintain an action to quiet title to the land.

**2. Same—Jurisdiction of Courts Prior to the Patent.**

> Under the pre-emption laws of the general government the courts have no jurisdiction. until after the patent has been issued, to pass upon conflicting claims, arising between private parties, involving title to public land.

(Argued February 10, 1888; reversed, and opinion filed, May 8, 1888.)

Appeal from the district court of Grant county; Hon. L. K. CHURCH, Judge.

*Mellette & Mellette* and *J. F. Fisher*, for appellant.

The doctrine has been long settled and uniformly upheld that, while the legal title to lands remain in the United States, and proceedings for acquiring this title are yet *in fieri*, the courts will not interfere to control the exercise of the power vested in the land department of the government. All conflicts arising out of these proceedings, and all questions pertaining thereto prior to the issuance of the patent, belong exclusively to that department for adjustment. *U. S.* v. *Schurz*, 102 U. S. 396; *Forbes* v. *Driscoll*, 31 N. W. Rep. 633.

*R. B. Smither* and *Geo. W. Hawes*, for respondents.

The two cases cited by appellant are not in point. We maintain that the district courts, being possessed of equitable jurisdiction, have original jurisdiction over the subject-matter of all actions arising out of a controversy between individuals involving title to real property or the boundary thereof, except in actions of forcible entry or forcible and unlawful detainer, (section 28, C. C. Pro.,) either before or after patent issues.

The settled doctrine of both state and federal courts is that a purchaser acquires an equitable title when he has completed his part of the contract; and a purchaser of public land, receiving a certificate of purchase or receiver's receipt, acquires an equitable title the same as on a sale by an individual owning the fee. *Brill* v. *Stiles,* 35 Ill. 305; *Lindsey* v. *Hawes,* 2 Black, 554; *Arnold* v. *Chapman,* 2 Ia. 1.

TRIPP, C. J.    This is an action in the nature of a suit in equity, brought by the plaintiff, Francis Vantongeren, against the defendants, John Heffernan and Michael Brennan, to quiet title to certain lands situated in the county of Grant, Dak. The action was tried before a referee; and the facts found by the referee show that the plaintiff, Francis Vantongeren, on the 2d day of January, A. D. 1880, entered the S. W. $\frac{1}{4}$ of section 21, township 121, range 47, under the pre-emption law, and that Michael Brennan, defendant, on the 7th day of December, 1880, entered the N. W. $\frac{1}{4}$ of the same section, under the pre-emption law, and that each received, at the time of entry, the usual final receipt, and that the defendant Michael Brennan, on the 13th day of December, 1880, conveyed to the defendant John Heffernan the said N. W. $\frac{1}{4}$ of said section 21 by deed of warranty. These entries and final proofs were made under the survey of the United States in 1865. The referee further finds "that at the time the plaintiff in this action, in the spring of 1879, settled upon and improved the south-west quarter of section 21, township 121, range 47, under the government survey of 1865, there was not visible any section corners or landmarks, showing township, section, quarter lines or corners; that plaintiff, in selecting this quarter section of land, so far as the boundaries of the same are concerned, was governed by the Whetstone creek, and took and settled upon and improved said quarter section with reference to its location north of the Whetstone creek, except the twenty acres south of the Whetstone creek, as in these findings hereinbefore mentioned; also he was governed by the character of the soil, the land lying north of the Whetstone be-

ing of a far better quality than that lying south of the said Whetstone creek." Finding 17.

From the findings it further appears that in the month of September, 1882, the government of the United States caused a resurvey to be made of the township, including these quarter sections in controversy; and by this new survey the east and west quarter section lines between the N. W. and S. W. quarter of said section 21 were removed south about 80 rods; making the N. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$, under the survey of 1865, to become the S. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of section 21 under the survey of 1882. That the improvements of the plaintiff, consisting of a house, barn, granary and other buildings, breaking, etc., of the value of about $700, were made and erected prior to the new survey, and are situated on the N. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of said section 21 under the survey of 1865, and on the S. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ under the survey of 1882. There is no finding of the referee as to where the lines of the survey of 1865 were actually run, or where the section and quarter section corners were actually established with reference to this land, further than as shown by the location of these quarter sections upon the plats with reference to Whetstone creek, and other natural objects designated thereon. No patents have ever issued for either of said quarter sections.

The complaint alleges that, by virtue of the premises, he is the owner of said N. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of said section 21, under the survey of 1865, now designated as the S. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of section 21, under the survey of 1882; that the defendant has entered upon and disturbed his possession, has committed trespass, and threatens to commit trespass, thereon; and prays "that this court decree that plaintiff is the rightful owner of said south half of the north-west quarter of said section, as well as the north half of the south-west quarter of said section; that defendants have no rights or interest therein; that they be required to execute to plaintiff a good and sufficient deed of title to the said south half of the north-west quarter of said section, and that the title to said land be quieted in said plain-

tiff; and that he have judgment against the defendant for the sum of five hundred dollars, in addition to the relief prayed for in his original complaint."

The court confirmed the report of the referee, and thereupon ordered, adjudged, and decreed "that the plaintiff have judgment, as prayed for in his complaint, against the defendant, and each and all of them; that all adverse claims of the defendants, and each of them, and all persons claiming or to claim said premises, or any part thereof, through or under said defendants, or either of them, are hereby adjudged and decreed to be invalid and groundless; and that the plaintiff be, and he is hereby, declared and adjudged to be the true and lawful owner of the land described in the complaint, and hereinafter described, and every part and parcel thereof, and that his title hereto adjudged to be quieted against all claims, demands, or pretention of the defendants, or either of them."

The defendant Heffernan appeared, and demurred to the complaint, upon the ground, among others, that the court of equity had no jurisdiction to determine the plaintiff's *title* prior to issue of the patent; and, upon the overruling of his demurrer by the court, and exceptions allowed, he denied the jurisdiction of the court by answer, upon a statement, in allegation of facts, differing from the allegations of the complaint in the essential particular only as to the deviation of the east and west lines of the two surveys; the defendant alleging that the actual survey of 1865 ran its east and west lines between these quarter sections but a few rods only, to-wit, six or eight rods, north of the survey of 1882, and the plaintiff alleging that the deviation was about eighty rods.

After the entry of decree upon the findings of the referee, defendant brings the case to this court, assigning as error that the court below, prior to issue of patent, had no jurisdiction to *quiet title* in the plaintiff, and to determine the *ultimate* rights of the parties, while the *title* remained in the government.

It will be observed that this is not an action to recover the

possession, or to recover damages for disturbing the possession, but it is an action of the plaintiff in possession to forever bar the defendant and his grantees from asserting any title or interest in the land.    There is in the complaint a claim for damages for alleged trespass; but this is only incidental and auxiliary to the equitable cause of action set out.    Can such a final determination of title be made by the courts prior to issuance of the patent by the government?    Under our statute "any person settled upon the public lands belonging to the United States, on which settlement is not expressly prohibited by congress, or some department of the general government, may maintain an action for any injuries done the same, also an action to recover the possession thereof, in the same manner as if he possessed a fee-simple title to said lands."    Section 650, Code Civil Proc.

The plaintiff does not seek to recover under this section. He does not seek to recover for disturbance of his possession, but seeks to have a final determination of his title as against the defendants and their grantees, upon the theory that the final certificate issued by the land-officers vested in him a fee of the land which the courts can confirm as against the adverse claims of the defendants.

To maintain this action, the court will be required to hold that the ultimate title of the government passes by the final receipt, subject only to the formal or ministerial act of the department officers in issuing the patent; and that, when the local land officers have once issued a final receipt in cases of pre-emption, the commissioner of the general land-office and the secretary of the interior have no power to recall or cancel the same, but that the patent must issue thereon as of course.

We are led, then, to examine what force and effect is to be given to the final receipt in pre-emption cases; and, to do so intelligently, we will have to note the origin of the law, the changes that have been made therein, and the decisions of the courts rendered from time to time construing the provisions of the original and amended act.

While the pre-emption law may be said to have had its real commencement in 1841, yet, prior thereto, at times, the greed and rapacity of those who were entering large tracts of the public lands became so great that congress had to interfere to protect the actual settler, who had crossed the frontier in advance of the surveys, in the possession of his home and improvements; and these several pre-emption acts, though they differ, as we shall see further on, in many essential particulars, yet their object in the main, was to protect the actual settler in his selection of and his improvements upon the public lands. And while the powers of the different officers have been enlarged or diminished by the various enactments of congress, and these offices have been attached to and made adjuncts of the different departments of the government, yet the office of the commissioner of the general land-office, and the offices of the register and receiver of the local land-office, have remained the same in name from the early history of the government. The act of April 25, 1812, creating the general land-office and the office of commissioner, contained many of the powers, and prescribed many of the duties, that govern and control that office under later laws; and the pre-emption acts of 1830 and 1836, and the intermediate acts, contain many features of the "Pre-emption Act," as it is familiarly known, of 1841. The fundamental power to make sale of the public lands is contained in the section of the constitution that provides: "The congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." Section 3, art. 4, Const. U. S.

Under this provision of the constitution, congress, at a very early day, created the general land-office, and subdivided the public domain into land-districts for the sale and disposition of the public lands. This bureau or land department was at one time attached to the treasury department of the government, and was also at one time, in part, subject to the supervision of the war department, and also of the president of the United States; but later on this bureau became an adjunct of the

interior department, and has since that time so remained. The secretary of the interior department is now charged with the entire supervision of the public lands, and all public business relating thereto. Section 441, Rev. St. U. S., provides, among other things, as follows: "The secretary of the interior is charged with the supervision of public business relating to the following subjects: *First*, the census, when directed by law; *second*, the public lands, including mines." And the commissioner of the general land-office is charged with the performance of all executive duties appertaining to the sale of the public lands.

Section 453, Rev. St. U. S., reads as follows: "The commissioner of the general land-office shall perform, under the direction of the secretary of the interior, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and also such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the government."

It will be seen from these sections, and accompanying sections of the Revised Statutes, that the secretary of the interior is charged with the entire supervision of the survey and the sale of the public lands, and that the commissioner of the general land-office acts under his direction in executing the land laws of the United States. All sales and disposition of the public lands must pass under the inspection of the secretary of the interior in person, or that of the commissioner of the general land-office, by direction of the secretary of the interior. The register and receiver are but local officers of the several land-districts, charged with the performance of certain duties of a *quasi* judicial character, and subject to the direction and supervision of their superior officers, the commissioner of the general land-office and the secretary of the interior. These duties may be said, in general, to be to pass upon the qualifications and rights of the claimants to file upon and enter any part of the public lands, and to ascertain whether the lands applied for are open to settlement, and, finally, whether the applicant, in offering to prove up,.

has complied with the land laws and regulations of the department.

No section in the statutes makes any decision of the register and receiver final in express terms, and no section, by direct inference, implies that any decision of the local officers is not subject to revision and supervision, unless it be section 2273; which provides that "all questions as to the right of pre-emption arising between different settlers shall be determined by the register and receiver of the district within which the land is situated; and appeals from the decision of the district officers, in case of contest for the right of pre-emption, shall be made to the commissioner of the general land-office, whose decision shall be final, unless appeal be taken to the secretary of the interior." While this section is peculiar in its language, and in its terms is confined to pre-emption claims, and makes the decision of the commissioner final in such cases, unless appeal be taken to the secretary of the interior, and while it omits to state that the decision of the register and receiver shall be final unless an appeal be taken therefrom, yet the section has been generally construed to mean that, in case of *contest* as to the rights of pre-emption, the decision of the local officers, as to matters of fact, is final, unless an appeal be taken; and has generally been so respected by the department and the courts. Outside of this section we look in vain for an appeal from the decision of the local officers, or any section giving them the right of "determining" any question connected with their duties. It has been the practice, however, as I am informed, to permit appeals from the local officers to the commissioner and secretary upon many, if not all, the applications made by settlers, in any matters affecting their rights to the public lands; but this is done under the rules and regulations of the department, which form a large part of the land law of the country. It is therefore left very indefinite by the statutes as to what is the character of the jurisdiction exercised by the secretary and the commissioner over the local officers. In but one section is appellate jurisdiction expressly named, and there no provision is made as to procedure upon appeal, or

as to whether upon appeal the case is heard *de novo*, or reviewed
upon the case as made below.   But it matters little in effect
whether the jurisdiction be classed as revisory or appellate.   No
court has ever claimed that the commissioner or the secretary
hears the case *de novo;* and whether they act as appellate tri-
bunals proper, or boards of supervision, the result is practically
the same.   The secretary of the interior, and, under his direc-
tion, the commissioner of the general land-office, has a general
"supervision of all public business relating to the public lands."
What is meant by "supervision?"   Webster says supervision
means "to oversee for direction; to superintend; to inspect; as
to supervise the press for correction."   And, used in its general
and accepted meaning, the secretary has the power to oversee
all the acts of the local officers for their direction; or, as illus-
trated by Mr. Webster, he has the power to supervise their acts
for the purpose of correcting the same; and the same power is
exercised by the commissioner, under the secretary of the in-
terior.   It is clear, then, that a fair construction of the statute
gives the secretary of the interior, and, under his direction, the
commissioner of the general land-office, the power to review all
the acts of the local officers, and to correct, or direct a correc-
tion of, any errors committed by them.   Any less power than
this would make the "supervision" an idle act,—a mere over-
looking, without power of correction or suggestion.   It is further
evident, from a careful reading of the statute, that whatever
distinction exists, or was intended to exist, between the appel-
late and supervisory power there given, the supervisory power
is general, and applies to all business of the land department,—
to matters appealable and those not appealable; so that if it be
conceded that, in matters of contest between pre-emption set-
tlers, the determination of the local officers be final, it would
still be in the power of the secretary to so far revise their acts
as to call their attention to errors which they themselves have
committed, and that their action would not be final so long as
any power of revision exists, either in themselves or a higher
tribunal.   Legislative bodies have the power of reconsideration

of their acts, subject to rules prescribed and limited, up to the time of their final approval; and the acts of administrative and executive bodies are subject to revocation until they become final by proclamation, adoption, or approval in the manner prescribed by law. Even the judgments of courts are open to be modified or revised by the court rendering them during the term at which they are rendered. With how much greater force may it be argued that the acts of the local officers do not bind the department or the government until they have been examined and supervised by the commissioner of the general land-office, and that, until their acts have received the approval of the general land-office, they may be revised and corrected, or sent back for re-examination and correction. If the supervision placed in the hands of the secretary of the interior be anything less than this; if the local officers are sole arbiters of all questions of fact submitted to them, so that there is no power of correcting any mistake made by them, or any fraud imposed upon them,—then is the supervision of the department, as we have already said, an overlooking, without any power of direction; and the duties of the secretary and commissioner are ministerial, which the court could control by *mandamus* and injunction,—a power which the courts have uniformly refused to exercise which we shall see further on in this opinion.

It is said, proof must be made to the "satisfaction of the register and receiver only, as to residence and improvements, and that, upon making such proof, the entry-man receives his certificate, which entitles him to a patent; that the commissioner has no power to cancel this certificate; that the power of cancellation is essentially a judicial one; that the right conveyed by the certificate is a vested one; and that he cannot be deprived thereof without due process of law." This is a plausible statement of the proposition. But, in the first place, the commissioner or secretary is not seeking to pass upon the rights of the parties in a collateral proceeding; they are only reviewing, for the purpose of approval or rejection, the action of subordinate officers. They are not seeking to take original juris-

diction of an independent proceeding; their action is but the second step in the proceeding instituted by the pre-emptor himself to obtain title to his land. And what reason exists, it may well be asked, why the register and receiver may not a second time as well inquire as to the residence and cultivation of the land, as in the first instance? Who doubts the right of the register and receiver, in the first instance, to institute as rigid an examination of the parties and the witnesses as they may deem necessary and proper? And why are they not as well qualified to do this at a second as at the first examination of the case? Those officers are not required or permitted to *try* the question of fraud or perjury between individuals; that belongs to another and a judicial tribunal. They are allowed to investigate alleged fraud so far only as to determine what are the real facts as to settlement, residence, and cultivation. As to the question of cancellation of the certificate, the pre-emption law makes no provision for such an instrument to be executed by the local officers. It is a mere matter of department practice, for its protection, and the protection of the claimant; but it has no recognition in law requiring its issue or cancellation. It is true that the homestead law, enacted more than 20 years after the passage of the pre-emption law, recognizing the practice which had grown up under it, does speak of a "certificate," and indirectly recognizes such an instrument by prohibiting "any certificate or patent to issue before the expiration of five years;" but no provision is anywhere made for the making or issuing of such instrument. It is wholly a creation of department rule and regulation.

And the impropriety of the term "vested right," as applied to fraudulent entry, is apparent upon the statement of the proposition. It is true, the honest settler who has made proof to the satisfaction of the local officers has an inchoate right—a sort of determinable fee—in the land, and, to that extent, a "vested right." If the land is subject to entry, and the claimant has the necessary qualifications, and has honestly complied with the statutes, and the rules and regulations of the department, he

may be said to have a vested interest or right in the land, which, except in contested questions of fact, where the land department is the final arbiter, he may follow into the courts after the jurisdiction of the land department has ceased; but, strictly speaking, a man can have no "vested rights" while any act remains to be done, or while any act of revision is unexercised,—certainly not as against the government, which can neither be compelled to exercise that supervision, or restrained in its unjust exercise. As well might the beneficiary of some legislative act claim a "vested right" in the benefit conferred prior to the limit of reconsideration or approval of the act; and the claim would have less right to be so classed had the beneficiary procured the favorable enactment by his own willful fraud and misrepresentation. And, as to the claim that proof must be made to the satisfaction of the register and receiver only, this is by no means so clear from a careful reading of the statute. Section 2263 reads as follows: "Prior to any entries being made under and by virtue of the provisions of section 2259, proof of the settlement and improvement thereby required shall be made to the satisfaction of the register and receiver of the land-district in which such lands lie, agreeable to such rules as may be prescribed by the secretary of the interior, and all assignments and transfers of the right hereby secured, prior to the issuing of the patent, shall be null and void." To be sure, the register and receiver must be satisfied of the settlement and improvements required before entry can be made; but these words do not necessarily imply that their satisfaction is a finality upon the question of fact, or that the commissioner or secretary, in the exercise of their supervisory powers, may not also pass upon the sufficiency of the facts. The language of the homestead act is entirely different, and does not even state that it must be to their satisfaction; but it requires the claimant to prove, by credible witnesses, the facts of residence and cultivation. And the amendments made to this section, providing for taking the testimony before other officers than the register and receiver, provide that the register and receiver shall have the same fees

for "examining and approving" such testimony as they are allowed for "taking" the testimony in person. Section 2291, Rev. St. U. S. "Taking" and "examining" and "approving" testimony are feeble words to convey the implication of finality of action. But, concede all that can be claimed for these words of the sections under the pre-emption act, and that they made the local officers the final tribunal to pass upon the sufficiency of the facts as to settlement, residence, and cultivation, yet the supervisory power lodged in the secretary and commissioner would still give them the right to call the attention of the register and receiver to the mistake or fraud committed, and to direct them to re-examine the testimony and proofs with a view to correction of the alleged errors.

But it is said, the court is a so much better forum in which to determine such questions that congress could never have intended to allow men who are not generally lawyers to pass upon such important rights of the people. This argument might be urged with much greater force in case of *contesting settlers* for the same land,—a question in which the government has no interest further than that the land be awarded to the one entitled thereto; but in such cases the law may be said to be settled by the highest tribunal in the land that the decision of the department upon all questions of fact in such cases is final, and cannot be reviewed in the courts.

How, then, can it be argued that the courts can step in, pending the determination of a case in the land department, and cancel the final certificate or receipt, or annul any act of the department, or of one of its subordinate officers, in which public interests are involved? Congress has chosen, under its constitutional powers, to place the sale and disposition of the public lands under the management and supervision of the secretary of the interior. The land department is a bureau or tribunal, with its superior and subordinate officers; with its appellate and supervisory powers; and it is invested with the power to sell and dispose of the public lands of the United States, subject to statute law and such rules and regulations as the depart-

ment may see fit to adopt. No court or tribunal is designated for the hearing and determining of any question of fact that may arise in the performance of its duties. It has therefore, under the well-settled rule of the decisions, the power to determine all questions that arise in the exercise of the jurisdiction conferred; and, while many acts of the department involve the determination of questions of a grave judicial character, they are only collateral or incidental to the execution of the main duty imposed upon it, which is essentially of and pertaining to the executive or administrative department of the government. In theory, our government is divided into three great departments: the executive, legislative, and judicial. Although the jurisdiction of the one sometimes so overlaps that of the other, and the boundary line sometimes becomes so pale and indistinct, that it is not clear to the judicial eye, and the decisions of the court become confused and unsatisfactory, yet, when one of these departments is clearly charged with a certain jurisdiction, the courts will seek to protect and defend it, rather than to break down or invade it. It is upon this principle that courts will never declare a legislative enactment unconstitutional or void if any lawful meaning or construction can be given to it. And, upon the same principle, in the construction to be given to treaties, the courts will, if possible, follow the meaning given them by the executive and treaty-making powers. Here the congress, under its constitutional powers, has created this special tribunal, and conferred upon it this special jurisdiction over all the public lands. The duties required of the tribunal, administrative or executive in their character, are placed by the act of congress where they properly and necessarily belong,— under the supervision of an appropriate department of the executive branch of the government; and while any matter pertaining to the public lands, involving judgment and discretion, is pending before this department of the government, the courts will not interfere. This proposition may be said to be settled law. The supreme court has again and again refused to take cognizance of any matter pending for decision in the

land department, or any subdivision of it; and has announced, as a settled rule of the federal courts, that until the patent issues the jurisdiction of the land department is not ended, and that until the patent has been signed and recorded the power of the courts cannot be invoked. And this conclusion of the courts has been reached, not from a desire to shirk any responsibility belonging to the judicial branch of the government, or from a lack of desire to extend to the hardy pioneer the entire authority of the courts in the protection of his legal rights, but from an absolute want of power to interfere with the executive department in the performance of the duties with which it is charged. It is not material to the decision of this case upon what particular grounds the courts decline to interfere with the acts and decisions of the executive department. It is not always easy to define what are strictly executive acts with which the courts will decline to interfere, upon the ground that they belong to a co-ordinate branch of the government; but it is admitted in American jurisprudence that the executive department of the government is invested with certain executive or political powers, in "the exercise of which the officer uses his own discretion, and for which he is accountable only to his conscience and his country." Such acts can never be examined in a court of justice. It will also be conceded that all acts not coming within this strict rule of executive action, but which affect *private rights*, may, in a proper case, be examined by the courts; but acts of such a tribunal, involving judgment and discretion, can never be examined in a court of *law;* and it is upon this ground that the federal courts decline to examine the acts of the land department. The courts are by no means, however, without the power of redressing wrongs, or of punishing offenses which may have been committed in this or any other department of the government; and the court of *equity* is always open to construe and give meaning to the acts of the executive officers, and to declare that done which in equity and good conscience ought to have been done. No branch of the government is without the reach of the *equity* arm of the court. Its powers sprang into

existence in the days of executive oppression and tyranny, and came to us by inheritance with the common law of our country.

Judgments of the higher courts are not beyond its jurisdiction. All executive and legislative acts are subject to its supervision when they are founded in fraud or mistake, or come within any of the well-known rules of equitable jurisdiction. It is upon and within this principle that the courts of equity have examined and reviewed the decisions of the land department. Courts of *law*, however, are powerless to act in such cases. No court of law can pronounce judgment upon any act of the land department, declaring it invalid, unless the act be absolutely void and of no effect; but the court of equity will review their acts so far as to determine whether its officers have violated or misconstrued any law under which they have acted, and whether they have been imposed upon by fraud or mistake, and by which the rights that have been conferred upon one settler should have inured to the benefit of another; and if it is found, upon an investigation of their proceedings, that such error has been committed, it will be corrected, not by declaring their acts void, but by declaring them to have done what the law presumes they would have done but for the commission of such error, and by decreeing the title to the land which passed by the patent to the one so entitled thereto.

Such being the law as announced by the courts, what absurd results would follow the decision that no tribunal but a court could cancel a final certificate once issued!

Must the commissioner and secretary pause when, in the exercise of their supervisory powers, they find the local officers have been imposed upon by fraud, and go to the courts, where litigation may be prolonged for years, before the case can be closed upon the books of the department? And when a decision were once reached, of what binding force or effect would it be upon the department? It is very clear, within the decisions, that the courts of equity would not cancel the certificate. The most they could do would be to declare that the certificate belonged to another; and, as the courts cannot control the department in

its issue of the patent, it could still issue the patent to the original certificate holder, making still another suit necessary to convey the title.

The better rule then is, as laid down by the courts, that they will not interfere with the acts of the land-officers so long as the department has jurisdiction to act, or until its jurisdiction has ceased, and its determination become final, by issuance of the patent. And the reason for this rule is that so long as any tribunal has jurisdiction of the subject-matter, and errors have occurred, the presumption is that it will correct such errors before its jurisdiction ceases. Within this rule, our own supreme court at the May term, 1886, in *Territory* v. *District Court*, 30 N. W. Rep. 145, dismissed the writ of *certiorari*, because it appeared in the proceedings that the motion had been made in the court below, and was undetermined, to vacate or modify the order complained of; and, if this is true as to appellate courts in matters for review by *certiorari* or appeal, *a fortiori* the principle may be invoked in cases like the present, where the courts have no power to review by appeal or otherwise, and where their judgments are without force to order the department to act, or cease to act.

The principles here enunciated, and the conclusions of law arrived at, are deducible from, and, in our judgment, are fully sustained by, the decisions of the supreme court of the United States, and the later decisions of the supreme courts of the different states. As early as *Bagnell* v. *Broderick*, 13 Pet. 436, the supreme court of the United States announced the doctrine "that congress has the sole power to declare the effect and precedence of titles to the public lands emanating from the United States; and that, whatever may be the equities outstanding in third persons, the patentee has the legal title; and that the state law cannot confer upon the equitable owner the right to maintain ejectment against the patentee." See, also, *Wilcox* v. *Jackson*, 13 Pet. 498.

*Barnard's Heirs* v. *Ashley's Heirs*, 18 How. 43, is one much in point upon the proposition that the action of the register and

receiver, in issuing the certificate or receipt, is not final, but that their action is subject to the supervision of the commissioner and secretary. It was contended in that case that the action of the register and receiver was final; that the commissioner had no power to reverse their findings upon the questions of fact; nor had the courts any power to review their action in determining the right of pre-emption. The court denies both of these propositions; and Mr. Justice CATRON, in delivering the opinion of the court, says: "In cases arising under the pre-emption laws of the 29th of May, 1830, and of the 19th of June, 1834, the power of ascertaining and deciding on the facts which entitle a party to the right of pre-emption was vested in the register and receiver of the land-district in which the land was situated, from whose decision there was no direct appeal to higher authority. But, even under these laws, the proof on which the claim was to rest was to be made 'agreeably to the rules to be prescribed by the commissioner of the general land-office;' and, if not so made, the entry would be suspended when the proceeding was brought before the commissioner by an opposing claimant. In cases, however, like the one before us, where an entry had been allowed on *ex parte* affidavits, which were impeached, and the land claimed by another, founded on an opposing entry, the course pursued at the general land-office was to return the proofs and allegations, in opposition to the entry, to the district office, with instructions to call the parties before the register and receiver, with a view of instituting an inquiry into the matters charged,—allowing each party, on due notice, an opportunity of cross-examining the witnesses of the other, each being allowed to introduce proofs; and, on the close of the investigation, the register and receiver were instructed to report the proceedings to the general land-office, with their opinion as to the effect of the proof, and the case made by the additional testimony. And on this return the commissioner does in fact exercise a supervision over the acts of the register and receiver. This power of revision is exercised by virtue of the act of July 4, 1836, § 1, which provides 'that, from and after

the passage of this act, the executive duties now prescribed, or which may hereafter be prescribed, by law, pertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and also such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the government of the United States, shall be subject to the supervision and control of the commissioner of the general land-office, under the direction of the president of the United States.'

" The necessity of 'supervision and control,' vested in the commissioner, acting under the direction of the president, is too manifest to require comment further than to say that the facts found in this record show that nothing is more easily done than apparently to establish, by *ex parte* affidavits, cultivation and possession of particular quarter sections of land when the fact is untrue. That the act of 1836 modifies the powers of registers and receivers, to the extent of the commissioner's action in the instance before us, we hold to be true; but if the construction of the act of 1836, to this effect, were doubtful, the practice under it for nearly twenty years could not be disturbed without manifest impropriety."

While this decision was founded upon the act of 1836, it will be observed that the provisions of the section quoted, upon which the court relies for the power of the commissioner to reverse the action of the local officers on questions of fact, do not materially differ from the powers conferred by sections 441, 453, Rev. St. U. S., upon the secretary of the interior and the commissioner of the general land-office; and the concluding portion of the quotation, that, "if the construction of the act were doubtful, the practice for nearly twenty years could not be disturbed without manifest impropriety," applies with equal and greater force to the case at bar; for the practice which it seems by that decision obtained under the act of 1836, and was continued under the act of 1841, of returning the proofs and allegations to the local office, with instructions to call the parties before them for inquiry into the matters therein charged, and

which, at the time of the rendition of that opinion, had been, says the court, the practice for "nearly twenty years" has been now the practice for more than fifty years.

Justice MILLER, in *Johnson* v. *Towsley*, 13 Wall. 82, referring to this decision, and the power of *supervision* vested in the commissioner and secretary, says: "By the first section of the act to reorganize the general land-office, approved July 4, 1836, it was enacted that the executive duties now prescribed, or which may hereafter be prescribed, by law, appertaining to the surveying and sale of the public lands, and the issuing of patents for all grants of land, under the authority of the United States, shall be subject to the supervision and control of the commissioner of the general land-office, under the direction of the president of the United States. In the case of *Barnard's Heirs* v. *Ashley's Heirs*, 18 How. 45, it was held that this authorized the commissioner to entertain appeals from decisions of the register and receiver in regard to pre-emption claims, and it is obvious that the direct control of the president was contemplated whenever it might be invoked."

*Bell* v. *Hearne*, 19 How. 252, was a case where the receiver, under the act of 1820, made two receipts for the purchase money,— one in the right name of "*John* Bell," and the other, which he forwarded to the general land-office, in the name of his brother, "*James* Bell,"—and the patent was issued to "*James* Bell;" but the commissioner of the general land-office in 1850, 11 years after the entry, upon his attention being called to these facts, recalled the patent, and changed the certificate from "*James* Bell" to "*John* Bell." Counsel for *James* Bell and his grantees denied the power of the commissioner to change the certificate, or to recall the patent; but the court, denying the position of counsel, by Justice CAMPBELL says: "The question, then, arises, had the commissioner of the general land-office authority to receive from John Bell the patent erroneously issued in the name of 'James Bell,' and to issue one in the proper name of the purchaser? And the question, in our opinion, is exceedingly clear. The commissioner of the general land-office exercises a general

superintendence over the subordinate officers of his department, and is clothed with liberal powers of control, to be exercised for the purposes of justice, and to prevent the consequences of inadvertence, irregularity, mistake, and fraud in the important and extensive operations of that officer for the disposal of the public domain." 19 How. 262.

In *Magwire* v. *Tyler*, 1 Black, 195, the secretary of the interior set aside a survey made under a confirmed Spanish grant, and ordered another to be made, and a patent issued under it; and the supreme court, in sustaining the action of the secretary, and the commissioner of the general land-office acting under his direction, uses the following language: "By the act of July 4, 1836, reorganizing the general land-office, plenary powers are conferred on the commissioner to supervise all those surveys of public lands, and 'also such as relate to private claims of land and the issue of patents.' By the act of March 3, 1849, the interior department was established. The third section of the act vests the secretary, in matters relating to the general land-office, including the powers of supervision and appeal, with the same powers that were formerly discharged by the secretary of the treasury. The jurisdiction to revise on the appeal was necessarily co-extensive with the powers to adjudge by the commissioner. We are therefore of the opinion that the secretary had authority to set aside Brown's survey of Labeaume's tract, order another to be made, and to issue a patent to Labeaume, throwing off Brazeau's claim." 1 Black, 202.

The case of *Harkness* v. *Underhill*, Id. 316, is in point in the determination of the question before us. It is true, the rights of the parties were founded upon the pre-emption acts of 1832 and 1834, and that other questions were before the court, such as estoppel, the rights of innocent purchasers, etc., and were determined in the case; but the question here presented was there squarely presented, and passed upon by the court. The case is not very well reported; the decision itself not stating the facts, and the statement of facts given by the reporter being somewhat obscure. Yet it sufficiently appears from the case, as

reported, that one Waters went upon the land as a pre-emptor under the act of 1832, put up what is styled a "pen," without any roof, and in which he slept only one night. Waters offered to prove up, and produced his own and the affidavits of other witnesses to the local land-officers, tending to show residence, cultivation, etc., but his entry was denied upon the ground that the surveys were not extended over the land. Waters subsequently died without proving up, and his heirs perfected the entry, and obtained the usual certificate. Stillman subsequently informed the commissioner of Waters' failure to reside upon and cultivate the land, and thereupon the commissioner instructed the local officers "that if they believed the facts, as respects the frauds practiced to obtain the entry in Waters' name, to treat it as void for fraud, and to allow Stillman's heirs to enter the land." And this was accordingly done. The entry in Stillman's name was made under the occupant law of 1834. A patent was subsequently issued to Stillman; and this plaintiff, as one of the heirs of Waters, brought this action to compel the grantee of Stillman to convey. Mr. Williams, attorney for complainants, makes the issue squarely in his brief, as follows: "That the register and receiver, having sold the land to Waters in conformity with the instructions of the commissioner of the general land-office, had no further power or jurisdiction over it; nor had the commissioner of the general land-office power to set aside the sale, even for fraud. This could only be done by judicial authority." And Mr. Carlyle, attorney *contra*, in his brief, answers the proposition as follows: "No one but a settler and house-keeper upon the land was entitled to the right of pre-emption under the act of April 5, 1832. Waters was not a settler or housekeeper. He had, therefore, no right, no title, nothing but a fraudulent claim, wholly worthless and void. That being its character, the register and receiver and commissioner of the general land-office had authority to rescind, set aside, and treat as a nullity the entry made by his heirs on the false proofs produced by him in his life-time." The question was therefore squarely presented to the court by opposing counsel; and after

determining the other questions presented in the case, and after the statement of facts as to the cancellation of Waters' entry by the commissioner, the court, by Mr. Justice CATRON, upon this proposition, says: "The question is again raised whether this entry, having been allowed by the register and receiver, could be set aside by the commissioner. All the officers administering the public lands were bound by the regulations published May 6, 1836, (2 L. L. & O. 92.) These regulations prescribe the mode of proceeding to vacate a fraudulent occupant entry, and were pursued in the case before the court. This question has several times been raised and decided in this court, upholding the commissioner's powers;" citing *Garland* v. *Wynn*, 20 How. 8, and *Lytle* v. *State*, 22 How. 193.

In *Gaines* v. *Thompson*, 7 Wall. 347, the secretary of the interior having directed the commissioner of the general land-office to cancel an entry under which Gaines and others claimed a right to certain lands in Arkansas, they brought suit in the circuit court of the District of Columbia to restrain such cancellation, setting up their equitable claim to the land. The commissioner entered a plea to the jurisdiction of the court to interfere by injunction, and upon appeal to the supreme court of the United States the plea was sustained. Says the court, by MILLER, J.: "Certain powers and duties are confided to those officers, and to them alone; and however the courts may, in ascertaining the rights of parties in suits properly before them, pass upon the legality of their acts, after the matter has once passed beyond their control, there exists no power in the courts, by any of its processes, to act upon the officer so as to interfere with the exercise of that judgment, while the matter is properly before him for action. The reason for this is that the law reposes this discretion in him for that occasion, and not in the courts. The doctrine, therefore, is as applicable to the writ of injunction as it is to the writ of *mandamus*." A similar doctrine is announced by the court in *Secretary* v. *McGarrahan*, 9 Wall. 298, where a *mandamus* was brought to compel the affirmative action of the secretary to issue a patent upon showing made.

In *Frisbie* v. *Whitney*, 9 Wall. 187, the court, in delivering the opinion by Mr. Justice MILLER, uses the following pertinent language in reference to the supervisory powers of the department: "When all these prerequisites are complied with, [referring to settlement, cultivation, making proof, etc.,] and the claimant has paid the price of the land, he is entitled to a certificate of entry from the register and receiver; and after a reasonable time to enable the land-officers to ascertain if there are superior claims, and if in other respects the claimant has made out his case, he is entitled to receive a patent, which for the first time invests him with the legal title to the land."

*Litchfield* v. *Register*, 9 Wall. 575, was a case in which Litchfield claimed to be the owner of a large tract of land granted to the territory of Iowa for improving navigation of the Des Moines river, and he brought this action to restrain the register and receiver from allowing persons to file upon such lands. The bill was very full, setting out the grant and his claim of title; that the lands were in no manner public lands, nor subject to entry at the land-office; and that his title would become clouded by entry, etc. The bill was demurred to for want of jurisdiction, and the demurrer was sustained on appeal to the supreme court of the United States. Mr. Justice MILLER, delivering the opinion of the court, says: "He says the court below erred because it did not require them to come in and answer to his claim of title, and at their own expense to put the court in possession of their views, and defend their instructions from the commissioner, and convert the contest before the land department into one before the court. This is precisely what this court has decided that no court shall do. After the land-officers shall have disposed of the question, if any legal right of the plaintiff has been invaded, he may seek redress in the courts. He insists that he now has the legal title. If the land department finally decides in his favor, he is not injured. If they give patents to the applicants for pre-emption, the court can then, in the appropriate proceeding, determine who has the better title or right. To interfere now is to take from the officers of the land department

the functions which the law confides to them, and exercise them by the court."

*Johnson* v. *Towsley*, 13 Wall. 72, was a contest between pre-emption claimants, in which the local land-officers decided, upon the facts, in favor of Towsley, and the commissioner on appeal affirmed their decision, but the secretary of the interior reversed the decision of the commissioner, and awarded the land to John-son, not upon the facts, but upon the ground that Towsley was not a qualified pre-emptor, having already filed a declaratory statement for another tract of land. A patent having issued to Towsley before appeal to the secretary of the interior was taken, and a junior patent having, notwithstanding, issued to Johnson after decision of the secretary of the interior, Towsley brought this action to remove cloud, etc. The case was very elaborately argued, and the supreme court, by MILLER, J., goes over the en-tire ground of the jurisdiction of the courts to review the action of the land department, and affirms the decree of the supreme court of Nebraska in declaring the second patent void, upon the ground of misconstruction of law by the secretary of the interior. The court reaffirms its former decisions in which the action of the department upon questions of fact, or of mixed law and fact, is declared to be final, and puts the right of the court of equity to review the action of the land department upon the same ground which gives it jurisdiction to examine judgments of courts of law, or the decisions of any tribunal procured through fraud, mistake, etc. Upon the questions of jurisdiction the court says: "But, while we find no support to the proposition or counsel for plaintiffs in error in the special provisions of the statute re-lied on, it is not to be denied that the argument is much stronger when founded on the general doctrine that, when the law has confided to a special tribunal the authority to hear and deter-mine certain matters arising in the course of its duties, the de-cision of that tribunal, within the scope of its authority, is con-clusive upon all others. That the action of the land-office in is-suing a patent for any of the public land, subject to sale by pre-emption or otherwise, is conclusive of the legal title, must be

admitted under the principle above stated; and in all courts, and in all forms of judicial proceedings, where this title must control, either by reason of the limited powers of the court, or the essential character of the proceedings, no inquiry can be permitted into the circumstances under which it was obtained. On the other hand, there has always existed in the courts of equity the power, in certain classes of cases, to inquire into and correct mistakes, injustice, and wrong in both judicial and executive action, however solemn the form which the result of that action may assume, when it invades private rights; and, by virtue of this power, the final judgments of courts of law have been annulled or modified, and patents and other important instruments issuing from the crown, or other executive branch of the government, have been corrected or declared void, or other relief granted. No reason is perceived why the action of the land-office should constitute an exception to this principle. In dealing with the public domain, under the system of laws enacted by congress for their management and sale, that tribunal decides upon private rights of great value; and very often, from the nature of its functions, this is by a proceeding essentially *ex parte,* and peculiarly liable to the influence of frauds, false swearing, and mistakes. These are among the most ancient and well-established grounds of the special jurisdiction of courts of equity just referred to, and the necessity and value of that jurisdiction are nowhere better exemplified than its application to cases arising in the land-office." And further on in the same opinion the court says: "This court has at all times been careful to guard itself against an invasion of the functions confided by law to other departments of the government; and, in reference to the proceedings before the officers intrusted with the charge of selling the public lands, it has frequently and firmly refused to interfere with them in the discharge of their duties, either by *mandamus* or injunction, so long as the title remained in the United States, and the matter was rightfully before those officers for decision. On the other hand, it has constantly asserted the right of the proper courts to inquire, after the title had passed

from the government, and the question became one of private·
right, whether, according to the established rules of equity and
the acts of congress concerning the public lands, the party hold-
ing that title should hold absolutely as his own, or as trustee
for another.   And we are satisfied that the relations thus estab-
lished between the courts and the land department are not only
founded on a just view of the duties and powers of each, but are
essential to the ends of justice, and to a sound administration
of the law."    The decision, it will be observed, makes the juris-
diction of the court·to depend upon the fact that a private right
is affected; that until the patent has issued the title is in the
government; and that the matter belongs to the land depart-
ment, and is *in fieri.*

*Myers* v. *Croft*, 13 Wall. 291, merely holds that the pre-
emptor after entry, and before patent issues, may dispose of or
sell the land.   It is merely a judicial construction of the words of
the pre-emption act, "all assignments and transfers of the right
hereby secured, prior to the issuing of the patent, shall be null
and void."   It was and had been contended that all convey-
ances after entry, and before patent issue, were, by force of this
statute, null and void; and that case merely decides that the
prohibition goes to transfers of the *pre-emption right*, and not to
transfers of the *land*.   The case in no respect intimates that the
grantee would get any better title than his grantor had, or that
any title would pass if the grantor had not in good faith entered
the land conveyed; but the concluding portion of the opinion in-
dicates very strongly the contrary opinion of the court:   "If it
had been the purpose of congress to attain the object contended
for, it would have declared the lands themselves unalienable
until the patent was granted.   Instead of this, the legislation
was directed against the assignment or transfer of the right se-
cured by the act, which was the right of pre-emption, leaving
the pre-emptor free to sell his land after the entry, *if at that time
he was in good faith the owner of the land, and had done nothing
inconsistent with the provisions of the law on the subject.*"

This very provision against the assignment or transfer of the

pre-emption right is a very strong argument in favor of the right of the commissioner and secretary to review the action of the register and receiver in allowing the entry.   The right of pre-emption is a valuable one, and but for such prohibition would be assignable, and the right of the fraudulent pre-emptor might pass into the hands of the innocent and *bona fide* holder before it could be revised or passed upon by the supervising officers. This statute was enacted to prevent such transfers, and to give the department time to examine the entry.   This view is strengthened by the fact that a similar provision is found in the act of 1830, and that prohibition was removed in the subsequent act of 1832, and the patent was permitted to issue in the name of the assignee; but, when the general act of 1841 was enacted, the original safeguard as to assignments was again included by congress, and the prior legislation of 1830 re-enacted.

The case of *Marquez* v. *Frisbie*, 101 U. S. 473, is directly in point, and announces the rule very clearly which must govern this case.   The appellant brought his action in the state court, alleging—*First*, that the land department mistook the law of the case; *second*, that its decision was obtained by fraud.   The subject-matter of the suit was a quarter section of land which had been awarded to appellees by the local land-officers upon a contest of the pre-emption right, and their decision had been affirmed on appeal by the commissioner and the secretary of the interior. The appellant was in possession, and prayed that the title which might pass by issue of the patent to appellees should be conveyed to or inure to his use and benefit; that he be declared the true owner; and that his right to the legal title be paramount.

The case was heard in the inferior state court on demurrer to the petition, which was sustained; and the judgment there rendered against plaintiff was affirmed by the supreme court of the state, from which judgment the plaintiff appealed to the supreme court of the United States.   The patent had not issued, but the decision of the secretary of the interior, it seems, had been rendered, directing patent to issue.   The supreme court, in affirming the judgment of the court below, and denying the plaintiff's

right to maintain the action, says: "One of them [fatal objections to the complaint] is that the principal relief sought, that without which any other would be imperfect, is that defendants may be declared to hold the land in trust for plaintiff, and compelled to convey the same accordingly. This undoubtedly means the legal title to the land; for he alleges that he was in actual possession at the time of instituting the suit, and for a great many years before. But the bill does not show that the defendants, or either of them, ever had the legal title. On the contrary, it is a necessary conclusion from the allegations of the bill that the legal title is in the United States. After referring to the decision of the secretary of the interior against his claim, the petition says that, ' in pursuance of this decision, an order . was issued authorizing the defendants, and other purchasers of the Vallejo title, to enter the lands claimed by them; and the said defendants have entered, and will be enabled to receive a patent for, the said quarter section.' It plainly appears from this—*First*, that the defendants had not the legal title; *second*, that it was in the United States; and, *third*, that the matter was still *in fieri*, and under the control of the land-officers. Nothing in the record of the case gives evidence that any further steps in that department have been taken in the case. We have repeatedly held that the courts will not interfere with the officers of the government while in the discharge of their duties, in disposing of the public lands, either by injunction or *mandamus*. *Litchfield* v. *Register*, 9 Wall. 575; *Gaines* v. *Thompson*, 7 Wall. 347; *Secretary* v. *McGarrahan*, 9 Wall. 298. And we think it would be quite as objectionable to permit a state court, while such a question was under the consideration and within the control of the executive departments, to take jurisdiction of the case by reason of their control of the parties concerned, and render decree, in advance of the action of the government, which would render its patents a nullity when issued.

After the United States has parted with its title, and the individual has become vested with it, the equities subject to which he holds it may be enforced, but not before. *Johnson* v. *Towsley*,

13 Wall. 72; *Shepley* v. *Cowan*, 91 U. S. 330. We did not deny the right of the courts to deal with the possession of the land prior to the issue of the patent, or to enforce contracts between the parties concerning the land; but it is impossible thus to transfer a title which is yet in the United States."

Here is distinctly announced by the supreme court the doctrine that the courts will not interfere to determine the rights of parties while the case is pending before the department, even when the decision of the department is already announced, before patent issues. The case is still *in fieri* until the patent is issued. The case is quite in point; but a much stronger case is here presented for the application of the rule announced, where the court is asked to pronounce upon the validity of the final receipt prior to the *contest or review had* by the commissioner or secretary.

*U. S.* v. *Schurz*, 102 U. S. 378, is a case in which the patent had been signed, sealed, and recorded, and sent to the local office for delivery, and had been subsequently recalled by the department. The proceeding was by *mandamus* on the part of the patentee to compel delivery of the patent by the secretary of the interior, and the question was whether the title had passed to the patentee, so that he was entitled to the delivery of the patent. It was contended, on the one side, that title passed by delivery of the patent, as in case of a deed; and, by the other side, that it passed by record. The court adopted the latter view, and held the act of delivery a mere ministerial act; that the title passed by record of the patent in the general land-office; that the jurisdiction of the land department was then at an end, and the courts could then take jurisdiction and compel a delivery.

The case was ably presented, and the opinion by Justice MILLER reviews the entire jurisdiction of the courts to interfere with the acts of the land department, and lays down the rule, affirming the former doctrine, already announced, that the court will not interfere with the action of the land department until its jurisdiction ceases, and that such jurisdiction ceases when the patent issues or is recorded in the general land-office. Says

v.5DAK.—14

the court: "Congress has also enacted a system of laws by which rights to these lands may be acquired, and the title of the government conveyed to the citizen. This court has, with a strong hand, upheld the doctrine that so long as the legal title to these lands remained in the United States, and the proceedings for acquiring it were as yet *in fieri*, the courts would not interfere to control the exercise of the power thus vested in that tribunal. To that doctrine we still adhere." And, further on in the same opinion, the court says: "From the very nature of the functions performed by these officers, and from the fact that a transfer of the title from the United States to another owner follows their favorable action, it must result that, at some stage or other of the proceedings, their authority in the matter ceases. It is equally clear that this period is, at the latest, precisely when the last act in the series essential to the transfer of title has been performed. Whenever this takes place, the land does cease to be the land of the government; or, to speak in technical language, the legal title has passed from the government, and the power of these officers to deal with it has also passed away."

The action of the secretary in recalling the patent in this case was sought to be sustained by showing that the land was not subject to homestead entry, and that the patent was therefore void; but the court, in answer to this proposition, and further defining the powers of the land department, says: "To the officers of the land department, among whom we include the secretary of the interior, is confided, as we have already said, the administration of the laws concerning the sale of the public domain. The land, in the present case, had been surveyed; and, under their control, the land in that district generally had been open to pre-emption, homestead entry, and sale. The question whether any particular tract belonging to the government was open to sale, pre-emption, or homestead right, is in every instance a question of law, as applied to the facts, for the determination of those officers. Their decision of such question, and of conflicting claims to the same land by different parties, is judicial in its character. It is clear that the right and the duty

of deciding all such questions belong to those officers, and the statutes have provided for original and appellate hearings in that department, before the successive officers of higher grade, up to the secretary. They have therefore jurisdiction of such cases, and provision is made for the correction of errors in the exercise of that jurisdiction. When their decision of such a question is finally made and recorded in the shape of the patent, how can it be said that the instrument is absolutely void for such errors as these?"

In *Quinby* v. *Conlan*, 104 U. S. 420, the holder of the patent brought ejectment to recover possession, and the defendant set up his defense, claiming to be the equitable owner, and demanding conveyance of the legal title, upon the grounds—*First*, that he was the prior pre-emptor, and that the land came within the Mexican grant entitling him thereto; but the court, in a careful review of the case, and denying the right of the court of equity to interfere, reaffirms the doctrine of the former cases, that upon all questions of fact the findings of the land department are final, and extends the rule to mixed questions of law and fact as well; and further says that the misconstruction of law which will authorize a court of equity to interfere must be clearly manifest, and it must appear that the fraud relied upon must necessarily have affected the action of the department. The court says: "It would lead to endless litigation, and be fruitful of evil, if a supervisory power were vested in the courts over the action of the numerous officers of the land department on mere questions of fact presented for their determination. It is only when those officers have misconstrued the law applicable to the case, as established before the department, and thus have denied to parties rights which, upon a correct construction, would have been conceded to them, or where misrepresentations and fraud have been practiced, necessarily affecting their judgment, that the court can, in a proper proceeding, interfere and refuse to give effect to their action. On this subject we have repeatedly and with emphasis expressed our opinion, and the matter should be deemed settled. *Johnson* v. *Towsley*, 13 Wall. 72; *Shepley* v.

*Cowan,* 91 U. S. 330; *Moore* v. *Robbins,* 96 U. S. 530.   And we may also add, in this connection, that the misconstruction of the law by the officers of the department which will authorize the interference of the court must be clearly manifest, and not alleged upon a possible finding of the facts from the evidence different from that reached by them; and, where fraud and misrepresentations are relied upon as grounds of interference by the court, they should be stated with such fullness and particularity as to show that they must necessarily have affected the action of the officers of the department.   Mere general allegations of fraud and misrepresentations will not suffice."

*Steel* v. *Smelting Co.,* 106 U. S. 447, 1 Sup. Ct. Rep. 389, was ejectment brought by the holder of the patent to recover possession.   The defendant set up various defenses at law, and a counter-claim for improvements.   A demurrer to the answer was sustained, and the question reached the supreme court of the United States upon the judgment sustaining the demurrer; and that court held that no defense at law could be set up against the patent; that infirmities of title upon which the patent was based could only be reached in a court of equity.   The court, by FIELD, J., in reiterating the doctrine so often asserted, almost impatiently adds : "We have so often had occasion to speak of the land department, the objects of its creation, and the powers it possesses in the alienation by patent of portions of the public lands, that it creates an unpleasant surprise to find that counsel, in discussing the effect to be given to the action of that department, overlook our decisions on the subject.

"That department, as we have repeatedly said, was established to supervise the various proceedings whereby a conveyance of title from the United States to portions of the public domain is obtained, and to see that the requirements of different acts of congress are fully complied with.   Necessarily, therefore, it must consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to sale.   Its judgment upon these matters is that of a special tribunal, and

is unassailable except by direct proceedings for its annulment
or limitation.  Such has been the uniform language of this
court in repeated decisions."  And, further on in the same opin-
ion, the court, in determining what the remedy is, and when it
can be claimed, says: "So with a patent obtained for land of
the United States, which is the result of the judgment upon the
right of the patentee by that department of the government to
which the alienation of the public lands is confided, the remedy
of the aggrieved party must be sought by him in a court of
equity, if he possessed such an equitable right to the premises
as would give him the title if the patent were out of the way.
If he occupy, with respect to the land, no such position as this,
he can only apply to the officers of the government to take meas-
ures in its name to vacate the patent or limit its operation.  It
cannot be vacated or limited in proceedings where it comes col-
laterally in question.  It cannot be vacated or limited by the offi-
cers themselves.  Their power over the land is ended when the
patent is issued and placed on the records of the department.
This can be accomplished only by regular judicial proceedings,
taken in the name of the government for that special purpose."

*Lee* v. *Johnson*, 116 U. S. 48, 6 Sup. Ct. Rep. 249, was a case
of contest between two homesteaders for the same quarter sec-
tion of land.  The local officers decided in favor of Johnson,
and the commissioner on appeal affirmed the decision; but the
secretary of the interior reversed the decision of the officers be-
low, and awarded the patent to Lee.  Upon suit instituted by
Johnson in the state court of Michigan, the supreme court of
that state took jurisdiction, and entered decree compelling con-
veyance to Johnson, upon the ground that the question before
the register and receiver was whether Johnson had *abandoned*
the land, and upon that question their decision was sustained
by the commissioner; but that the secretary of the interior,
while admitting the correctness of their decision upon the ques-
tion of *abandonment*, awarded the patent to Lee on the ground
that *no settlement* was ever made by Johnson, as required by the
homestead act,—a question not before him on appeal,—and that

his decision was the exercise of *original* and not *appellate* jurisdiction.   But the supreme court of the United States, reversing the supreme court of Michigan, held that the question determined by the secretary was properly before him, and was concluded by his decision, and that the courts had no jurisdiction to review its correctness; and in this opinion the court very clearly states when and upon what ground the courts will interfere to examine the decisions of the land department: "The defendant in the court below, the plaintiff in error here, is the holder of a patent of the United States for a parcel of land in Michigan, issued to him under the homestead laws; and the present suit was brought to charge him as trustee of the property, and to compel a conveyance to the plaintiff.   The patent having been issued by officers of the land department, to whose supervision and control are intrusted the various proceedings required for the alienation of the public lands, all reasonable presumptions are indulged in support of their action.   It cannot be attacked collaterally, but only by a direct proceeding instituted by the government, or by parties acting in its name and by its authority.

"If, however, those officers mistake the law applicable to the facts, or misconstrue the statutes, and issue a patent to one not entitled to it, the party wronged can resort to a court of equity to correct the mistake, and compel the transfer of the legal title to him as the true owner.   The court, in such a case, merely directs that to be done which those officers would have done if no error had been committed.   The court does not interfere with the title of a patentee when the alleged mistake relates to a matter of fact, concerning which those officers may have drawn wrong conclusions from the testimony.   A judicial inquiry as to the correctness of such conclusions would encroach upon a jurisdiction which congress has devolved exclusively upon the department.   It is only when fraud and imposition have prevented the unsuccessful party in a contest from fully presenting his case, or the officers from fully considering it, that a court will look into the evidence.   It is not enough, however, that

fraud and imposition have been practiced upon the department, or that false testimony or fraudulent documents have been presented. It must appear that they affected its determination, which otherwise would have been in favor of the plaintiff. He must in all cases show that, but for the error or fraud or imposition of which he complains, he would be entitled to the patent; it is not enough to show that it should not have been issued to the patentee. It is for the party whose rights are alleged to have been disregarded that relief is sought; not for the government, which can file its own bill when it desires cancellation of the patent unadvisedly or wrongfully issued."

While, from this review of the decisions of the supreme court of the United States, it will be observed that the court has uniformly declined to review the action of the land department until its jurisdiction has ceased, and to determine the finality of title until after the patent has issued, yet it is nowhere denied that courts of law may not always be appealed to, in furtherance of the decisions of the department during its exercise of jurisdiction, to protect the possession of the settler upon the public lands. And the undoubted weight of authority, as evidenced by the decision of the courts of last resort in the various states and territories, is in accordance with the views expressed by the supreme court of the United States.

In *Root* v. *Shields*, 1 Woolw. 340, Judge MILLER, of the United States supreme court, at the circuit, sustaining the action of the commissioner in canceling the prior entry of Root, a pre-emptor, and in issuing patent to a junior purchaser, upon the ground that the prior entry was void as coming within the boundaries of the incorporated city of Omaha, says: "It is further insisted, on behalf of the defendants, that they are *bona fide* purchasers, and that they, as such, are entitled to the protection of the court. I think it pretty clear that some, at least, of these defendants purchased and paid their money without any knowledge in fact of any defect in the title. Yet they are not *bona fide* purchasers for a valuable consideration without notice, in the sense in which the terms are employed in courts of equity; and this, for

several reasons. They all purchased before the issue of the patent. The more meritorious purchased after the entry had been assailed, and decided against by the land-office. But that is a circumstance not material to this consideration. Until the issue of the patent, the legal title remained in the United States. Had his entry been valid, Shields would have taken only an equity. His grantees took only an equity; they did not acquire the legal title; and, in order to establish in himself the character of a *bona fide* purchaser, so as to be entitled to the protection of chancery, the party must show that in his purchase, and by the conveyance to him, he acquired the legal title. If he have but an equity, it is overreached by the better equity of his adversary."

The decisions of various state courts will be more intelligently comprehended in grouping them by states. *Arnold* v. *Grimes*, 2 Iowa, 1, is cited and much relied upon as announcing a contrary doctrine. The case is an early one. Arnold first entered the land in controversy under the pre-emption act of 1840, and obtained a final certificate. Then Chapman, who settled upon the land about the same time, after Arnold's entry, applied for leave to contest. After considerable correspondence, and after Chapman had notified the commissioner that Arnold had conveyed the land by deed, prior to his entry, which deed in fact, however, had been obtained by Chapman himself by fraud and duress, upon Chapman's letter; the commissioner directed an inquiry by the register and receiver; and, they finding such deed to have been made, the commissioner canceled Arnold's entry. Subsequently Arnold went to the court, and got the obnoxious deed set aside, and declared null and void, as having been executed under duress. He then applied to the department to have his entry reinstated; but in the mean time Chapman had been allowed to enter the land, and patent had been issued to him. The department at first declined to interfere, and advised Arnold to go to the courts; saying that the department would not have permitted Chapman's entry if the deed had been canceled when he made application to enter the land. And, upon fur-

ther application by Arnold, the department, to protect him, finally issued a second patent, and canceled Chapman's patent. Upon this state of facts the Iowa court held that the junior patent, issued upon the prior certificate, must prevail. That is all this case decides. The equities were all with Arnold; the department had done all it could to reinstate Arnold's claim, and advised the action of the courts; and the court of equity, enforcing the equitable rights of Arnold, seems to have validated the act of the department in issuing the patent to Arnold, rather than to have sought to invalidate its former acts. The question of fact upon which the court *seems* to conclude that the cancellation of Arnold's certificate was void, is that no appeal lay, under the act of 1840, to the commissioner, and that the action of the register and receiver was final. It says: "Did such an appeal exist? And was one taken? No act of congress is found giving such an appeal prior to that of September 4, 1841, which allowed an appeal to the secretary of the treasury. The prior pre-emption laws of May 29, 1830, June 22, 1838, June 1, 1840, contain no such provision. And by the instructions issued upon the act of 1838, when the register and receiver decided against a claimant, and he, being desirous of it, requested in writing the opinion of the general land-office, they are directed to transmit the papers and proofs. Thus far it would seem that, if the claim was *rejected* below, the commissioner might review it; but if the claim was allowed, and a certificate of purchase issued, no authority is yet seen for setting it aside."

This case was determined in December, 1855, and it would seem that the case of *Barnard's Heirs* v. *Ashley's Heirs*, 18 How. 43, decided at the December term, 1855, had not then been handed down, for no mention is made of the case; and the doctrine announced is in direct conflict with the statements of Judge CATRON, that an appeal did lie to the commissioner from the register and receiver by virtue of the section that gave him *supervision and control.*

In *Bellows* v. *Todd*, 34 Iowa, 31, the homestead entry of the defendant, under which he claimed to hold the land, had been

canceled by the commissioner of the general land-office, and the plaintiff offered to show this fact in rebuttal; but the court below sustained defendant's objection; and the supreme court, reversing the case upon this and other errors committed, uses the following language: "After defendant had closed his evidence, the plaintiff offered in rebuttal a writing from the department of the interior, signed by the commissioner of the general land-office, directed to the register and receiver of the local land-office at Fort Dodge, dated January 16, 1869, showing a cancellation of the defendant's homestead entry, which was objected to by defendant, and the objection sustained by the court. This ruling is assigned as error. This ruling was evidently erroneous. That the evidence offered was material, requires no argument to show. That it is competent for the officers of the land department of the government to cancel sales and entries of land which they may find improperly made, has frequently been decided by the supreme court of the United States."

It does not appear from the decision upon what ground the entry had been canceled, and no reference is made to *Arnold* v. *Grimes, supra.* The court seems to lay down the proposition as one about which state courts do not differ, and one which is at rest in that state.

*Sillyman* v. *King*, 36 Iowa, 207, and *Cady* v. *Eighmey*, 7 N. W. Rep. 102, clearly decide that the equitable title is in the holder of the receipt; that the legal title, which passes by patent, dates back to such certificate or receipt, notwithstanding the remark of the court in the last case that the "issuance of the patent is a mere ministerial act," etc.

The case of *Brill* v. *Stiles*, 35 Ill. 309, is cited and relied upon as authority holding that the commissioner has no power to cancel the final certificate, and that his doing so is void; and the strong language of the court—that "the mere fact that it was so declared by the commissioner of the general land-office did not have the effect of vacating the entry. He is not a judicial officer, and has no power to decree rescissions of contracts. His determination in reference to the validity of that sale concluded

no one in his rights,"—would seem to indicate that such was
the individual opinion of that judge.  But an examination of
the case shows that the plaintiffs filed their bill in equity, alleg-
ing that the grantor had entered the land in question at private
entry, and paid his money therefor; that such entry was only
liable to be defeated by a pre-emption entry within 30 days;
that no pre-emption entry was made within the 30 days; and that
his title became perfect.  Nearly two years thereafter the de-
fendant's grantor was permitted to enter the land, and received
a patent therefor, and plaintiff asked to be decreed the legal
title.  ·The defendant answered, admitting the material allega-
tions of the bill, but alleged that the former entry of the plain-
tiff had been canceled for some cause unknown to the defendant,
and asked that the bill be dismissed for want of equity, which
action was sustained; and it was to reverse such action of the
court that the appeal was taken.  The language of the court above
quoted was used by Judge WALKER in reversing the case.  Upon
such facts it would seem the case should have been reversed.

The plaintiff had a clear equitable title to the land on the al-
legations of the bill.  It was a private entry, subject only to be
defeated by a pre-emption filing within 30 days,—a contingency
which the bill alleges did not arise; and the defendant alleges
that he does not know on what ground the commissioner can-
celed the entry.  He did not cancel the entry on a question of
fact, if the allegations of the bill are true; for there was but
one contingency that could defeat him, to-wit, the filing of a
pre-emption within 30 days, and that did not happen.  The in-
ference is that he must have canceled the entry upon some
question of law; and such rulings of the commissioner, whether
in the matter of canceling certificates or other executive action,
is always open to review, and this was evidently the view of the
court; for, following the language quoted, the court says: "If
the entry was authorized by law, the title passed to him, subject
only to be defeated by proof of a right of pre-emption; and, if
unauthorized, he acquired no title.  But until it was shown to
have been illegally made, or to have been defeated by proof of a

pre-emption, the certificate of purchase was evidence of an equitable title."

There was also another fatal objection, says the court, to the ruling of the lower court, to-wit, "that the objection to the bill could only have been raised by demurrer," and not by motion.

But it will be idle to take time to examine the Illinois decisions further, and to reconcile any apparent conflict in them; for that court itself has saved us the trouble. In *Robbins* v. *Bunn,* 54 Ill. 48, after citing *Brill* v. *Stiles, supra,* and other decisions apparently in conflict with *Gray* v. *McCance,* and others, the court says:

"These two classes of cases may seem, at first, inconsistent with each other, and there are probably some expressions in the various opinions not strictly harmonious, but on further consideration it will be seen there is no real antagonism in the decisions. The cases in the first class [referring to *Gray* v. *McCance,* 14 Ill. 344, and others] relate to pre-emption claims upon which the land-officers have decided. The pre-emption law of 1830 required proof of the facts upon which the right of pre-emption depended, to be made to the satisfaction of the register and receiver, agreeable to rules to be prescribed by the commissioner of the general land-office. This, by implication, gave them the right to decide all cases of contested pre-emption, so far as they depend upon the fact of prior settlement; and this construction has been uniformly given to the law, as will be seen by the cases before cited, and in other authorities quoted in the opinions pronounced in those cases. The finding of the land-officers upon the facts in matters of pre-emption has been held conclusive by the courts, upon the familiar ground that such officers, in these proceedings, were acting in a *quasi* judicial capacity, and within the scope of their authority.

"But, on the other hand, when these officers have undertaken to cancel a patent or a certificate of entry for which a purchaser has paid his money, either at their discretion, or under some pretended regulation of the department which the law did not authorize, or under some clearly erroneous construction of the

laws of congress, the courts have held themselves not bound by such acts of the officers of the land department, because they were not exercising a judicial function within the limits prescribed by law. The cases cited by counsel for defendant will be found to relate to proceedings of this character. Between those two classes of authorities there is a clear and sound distinction. In the one, the proceedings of the land-officers are held conclusive, because judicial in their character, and within their conceded jurisdiction. In the other, such proceedings are held not conclusive, because they are either ministerial in their character, or, if judicial, beyond the authority given by the acts of congress."

This case was subsequently reversed by the supreme court of the United States, *eo nomine, Moore* v. *Robbins,* 96 U. S. 530, upon the ground that, as to the defendant Moore, the secretary of the interior had no power to entertain an appeal after the patent had issued, and as to the other defendant the secretary erred in a matter of law; but the principle of law announced by the Illinois court, above quoted, is confirmed by the supreme court, and the language of Justice FIELD in *Shepley* v. *Cowan,* 91 U. S. 340, is quoted, and approved as "aptly" stating the views of that court: "The officers of the land department are especially designated by law to receive, consider, and pass upon proofs presented with respect to settlements upon the public lands, with a view to secure rights of pre-emption. If they err in the construction of the law applicable to any case, or if a fraud is practiced upon them, or if they themselves are charged with fraudulent practices, their rulings may be reviewed and annulled by the courts when a controversy arises between private parties founded upon their decision; but for mere errors of judgment upon the weight of evidence in a contested case before them the only remedy is by appeal from one officer to another of the department, and perhaps, under special circumstances, to the president."

In *McLane* v. *Bovee,* 35 Wis. 27, McLane brought ejectment under his patent, and Bovee set up in defense that final certifi-

cate for the same land had been issued to him, and that, upon a trial had in the court, he had been adjudged possession under the certificate, and that such action was a bar, and that subsequent cancellation of his certificate by the commissioner was void. The court, denying both these propositions, says: "The most that can successfully be claimed for the present defendant, under the judgment of the former action, is that, when such an action was instituted, Frederick Bovee was seized of an estate in fee in the lands in question, belonging to the class which Professor Washburn denominates 'determinable fees,' which he defines to be 'fees which are liable to be determined by some act or event expressed on their limitation to circumscribe their continuance, or inferred by law as bounding their extent.' 1 Washb. Real Prop. *62.

That the commissioner of the general land-office had authority to cancel the certificate of Moon, for cause, at any time before patent issued, cannot be doubted. Such powers have been constantly exercised by the land-officers of the government, and the exercise thereof sustained by the courts ever since our land system was established. We here find the limitation on the fee, or its determinable quality inferred by law, mentioned in the above definition.

In *Trulock* v. *Taylor*, 26 Ark. 54, such titles are termed 'inchoate legal titles.' The title of Frederick Bovee, which was established by the former judgment, was legally determined by the cancellation of Moon's certificate of entry after the former action was commenced, and the whole title became thereby vested in the United States. The patent to McLane, the present plaintiff, conveyed that title to him, and, as we have seen, he may assert it in this action."

*Cornelius* v. *Kessel*, 58 Wis. 237, 16 N. W. Rep. 550, is quoted as holding that the commissioner had no power to cancel the final certificate. The case is imperfectly reported. There is no statement of facts, and it would seem that the entry which was canceled was a private entry, made in 1856. The court says: "The land, then, was subject to entry. It was purchased

by him and paid for.  There was no fraud or mistake in the transaction.  The receiver took the price of the land, and gave his receipt therefor."  On such a state of facts the court of equity would seem to have had jurisdiction within the well-adjudged cases, and the commissioner could not in such case cancel the entry.  It further appears from the facts stated in the opinion that the 40-acre tract in controversy was included with 80 acres of swamp lands, making the 120, the subject of the entry, all of which was canceled by the commissioner, instead of canceling the entry as to the 80 acres of swamp land; and this error, when discovered by the commissioner, was attempted to be corrected by his reinstating the entry as to this 40; but in the mean time other rights had intervened, which gave rise to the controversy.  The commissioner, so far as it appears from these facts, was clearly wrong in canceling the entry as to this 40, as admitted by the commissioner himself; and the effect of the decision is to declare the invalidity of the commissioner's act in this case, and not his want of power in general to cancel a final certificate for cause; and the court clearly did not intend more by the decision, as no reference is made to *McLane* v. *Bovee, supra,* or other decisions of that court.

In *Franklin* v. *Kelley,* 2 Neb. 79, is a very interesting discussion on the right of assignment before issue of the patent.  The case was determined before *Myers* v. *Croft,* 13 Wall. 294, had been decided.  The opinion is an elaborate one, announcing the doctrine, subsequently sustained by the United States supreme court, that a deed of lands made after entry, and before issue of the patent, is valid; but as the circuit court of the United States had held such deed void, and the United States supreme court had not then passed upon the question, the learned judge covered a wide field in his discussion of the question; and one point made in the argument of the court is that the provision of the statute was designed to cut off the right of innocent purchasers, and to give the supervisory officers time to examine the rights of the entry-man before the patent issues.  Says the court: "The act of 1841 provides that the entry shall be made

with the register of the land-office.  The acts organizing the land department of the government provide that the action of the register shall be subject to revision and supervision by the commissioner of the general land-office; and entry with the register is dependent upon the approval of his superior, so far as the course and order of the business goes; and, without the affirmative action of the commissioner, no patent issues.   It would be a great evil if a party claiming a pre-emption right could, as soon as his entry was made, convey the land to a third party, and thereby prevent the commissioner from re-examining and disapproving the entry if it was erroneously allowed.   Such a course would expose the government to serious loss, and pervert a statute conceived in a wise policy and generous spirit into the means of perpetrating the greatest frauds.   This is the mischief aimed at; the object was to protect the government; and in this view the language that the right secured by the act should not be assigned, is apt.   As between the claimant and the government, his interest is a right merely, until the patent issues.   It is subject to reinvestigation, and, on inquiry, to be disregarded by the department until the patent issues, which is treated by the government, not as a title, but as a right, or a claim of right."

This is a very clear statement of the powers and duties of the superior officers of the land department.

In *Smiley* v. *Sampson*, 1 Neb. 56, Judge MASON reviews all the cases in which the courts have looked into the facts in reviewing the action of the department, including *Lindsey* v. *Hawes*, 2 Black, 554; *Garland* v. *Wynn*, 20 How. 8; *Lytle* v. *Arkansas*, 22 How. 192; and others—and asserts that, in every one of these cases, the decision of the officers of the land department was obtained on *ex parte* affidavits, and not upon a hearing in which witnesses were examined and parol testimony taken.   This case was one of the first to announce that the decisions of the land department were final upon questions of fact, and was affirmed in the supreme court of the United States.   The case went up with *Johnson* v. *Towsley, supra;* and, nearly the same questions

being involved in both cases, no opinion was written in the United States supreme court in *Smiley* v. *Sampson,* but the opinion governing both cases was written in *Johnson* v. *Towsley,* *supra.*

In *Hestres* v. *Brennan,* 50 Cal. 211, plaintiff brought ejectment under his title from the state, and the defendants answered, alleging that they had entered the land under the pre-emption law, and presented their certificate of entry. It appears that, after entry by the pre-emptors and the issue of final certificate, the secretary of the interior canceled the certificates, and conveyed the lands to the state of California as having been selected prior to the entry by the defendants; but it does not appear that any appeal had ever been taken to the secretary; and it was contended—*First,* that the secretary had no power to cancel such entry; and, *second,* if he had such power, it would only be on appeal to him from the commissioner. But the court denied both propositions, and, in sustaining the act of the secretary in canceling the certificates, the court says: "The act of congress establishing the department of the interior confers upon the secretary the supervision of public business relating to several subjects, among which is that of public lands. The commissioner of the general land-office is vested with the authority to perform executive duties appertaining to the survey, sale, etc., of the public lands, 'under the direction of the secretary of the interior;' and the subordinate officers of the land department are subject to the supervision of the commissioner. Rev. St. U. S. §§ 441, 453, 2478. Both the secretary of the interior and the commissioner, in revising the acts of the subordinate officials of the land department, exercise supervisory rather than appellate power, in the sense in which the word 'appellate' is employed in defining the powers of courts of justice. The secretary of the interior, in the exercise of such authority, may approve, modify, or annul the acts, proceedings, and decisions of the commissioner. If, however, this power is to be regarded as an appellate power in a legal sense, it will be observed that the statute has not provided the machinery for

the taking of an appeal, and consequently that matter is subject to such rules and regulations as the department may prescribe. In this case it appears that the papers in the contest were transmitted to the secretary of the interior by the commissioner of the general land-office; and, in the absence of any showing to the contrary, it will be presumed that they were regularly and properly transmitted. We see no ground on which the decision and order of the secretary can be questioned, and, in our opinion, it definitely determines that the defendant had no legal right or title to the premises." The case, it is true, is one in which the court determines that no right of pre-emption ever existed, rather than that one once existing had been lost; yet the question determined by the secretary was one of fact, and not of law, within the decisions, and therefore final, and not open to review by the courts; and the reason of the court in sustaining the action of the secretary, in our opinion, correctly presents the extent and manner of exercising the *supervisory* jurisdiction. This case was followed in *Vance* v. *Kohlburg*, 50 Cal. 346, where the court admitted in evidence the cancellation of the final certificate of the commissioner, over appellant's objection, and the supreme court of California sustained the action of the court on the authority of *Hestres* v. *Brennan, supra.*

The power of the commissioner to cancel the final certificate has been determined by the Minnesota court in a number of cases, commencing with *Randall* v. *Edert*, 7 Minn. 450, (Gil. 359;) *Gray* v. *Stockton*, 8 Minn. 529, (Gil. 472;) and ending with *Judd* v. *Randall*, 29 N. W. Rep. 589. In the latter case the land was a commuted homestead, upon which final proof and payment had been made in November, 1878, and final receipt had been issued. The homesteader subsequently had sold the land, and thereafter, in June, 1882, and before the issue of patent, upon application and affidavits made by a third party to the commissioner of the general land-office, a hearing was ordered as to whether the final proof was fraudulent or obtained by perjury. Such hearing was had before the register and receiver, the entry was reported by them to the commissioner for

cancellation, and the receipt was ordered to be canceled by the commissioner, in February, 1883. This action of the commissioner in canceling the receipt was the only question before the court; and, in sustaining the power of the commissioner so to do, the court says: "The conclusion of the learned judge now under review, denying the right of recovery, is based upon his decision that the action of the officers of the land department, assuming to annul and cancel Andrew's entry, and the proceedings resulting in that end, were unauthorized and void. The correctness of this decision is the principal question presented before us. If we were not constrained by the considerations to which we are about to allude, it is probable that our decision would be in accordance with that under review; but, without setting forth the reasons which lead our minds towards that conclusion, we will state briefly the grounds of our decision to the contrary. It has long been the practice of the land department, in administering the various laws for the disposition of the public lands, even after final proof, and the issuing of the proper final certificate or receipt, and after the appointed proceedings with reference to making such proof have terminated, but before the issuing of the patent, to entertain proceedings anew, upon evidence produced before the commissioner of the general land-office going to show that the entry had been fraudulently made and completed, to order an investigation, and, upon proof of fraud, such entries have been canceled, [citing a large number of land-office decisions from Copp's Land Laws and Land-Owner.] This practice seems to have been sanctioned by the supreme court of the United States in *Harkness* v. *Underhill*, 1 Black, 316, and by this court in *Gray* v. *Stockton*, 8 Minn. 529, (Gil. 472.) We feel that we are compelled, by these adjudications in support of the established practice, to affirm the existence of the power in question, until the subject shall have been further considered by the supreme court of the United States, whose decisions concerning it are of paramount authority."

In *Ferry* v. *Street*, (Utah,) 11 Pac. Rep. 571, the court holds,

in an action of ejectment, in which the defense was that the lands, when entered, were occupied as a town-site, and were also mineral lands, that, "as to all questions of fact, the land department is called upon to consider and pass upon before issuing the patent; the judgment of this department is unassailable, except in a direct proceeding for its annulment; that among the questions the land department is called upon to consider are the character of the land, and the class to which it belongs,— whether agricultural or mineral, or whether it is within a town-site; that, if the land department had jurisdiction to grant a patent, the law conclusively presumes, in a collateral proceeding, the existence of all circumstances essential to the validity of the patent; that, unless the patent is void in view of the law of circumstances which the court may take judicial notice of, it must be held valid."

In Arizona, in *Jeffords* v. *Hine*, 11 Pac. Rep. 351, it was sought to defend against the patent by the party claiming a prior right, and to have a decree of title, on the ground that the receiver had acted as register and receiver both, the office of the register being vacant, and that the department holding that he was a *de facto* officer was error of law; but the court held that it was a mixed question of law and fact, which would not be disturbed by the courts.

In Kansas, *Darcy* v. *McCarthy*, 12 Pac. Rep. 104, is a very interesting case. Darcy originally had a homestead entry on the land in controversy, which McCarthy contested, and obtained it to be canceled, which, under the act of 1880, gave him the preference right of 30 days in which to file thereon or make entry. He availed himself of the right to enter the land as a homestead within 30 days. Subsequently, and after the expiration of the 30 days, Darcy was permitted to file a declaratory statement, alleging settlement prior to McCarthy's entry, and, under this declaratory statement, was permitted to prove up, and obtained the final receipt. McCarthy thereupon made application to the commissioner to have such receipt canceled, which was done by the commissioner, it appearing to him that

McCarthy's entry was made within the 30 days in which he had the exclusive right to enter the land. Darcy now brought ejectment, and, having offered his final receipt in evidence, McCarthy offered in evidence the cancellation of this entry by the commissioner, which was resisted upon the ground that the commissioner had no such power; but the action of the lower court, sustaining the admissibility of the evidence, and the power of the commissioner to cancel the entry, was affirmed by the supreme court in a vigorous opinion, in which, in referring to the powers of the superior officers of the land department, it says: "It is also claimed that the action of the register and receiver in allowing the cash entry of the plaintiff is conclusive on the land department, and that the commissioner has no authority to do that which his letter attempted to do. Although proof of the right to enter the land must be made to the satisfaction of the register and receiver, they are not the final arbiters of such right. They make returns of entries of land to the general land-office, which is under the charge of the commissioner. That officer has supervisory control over the subordinate officers in the land department, and can revise and correct their decisions. The entry relied on by the plaintiff was allowed by mistake, and without authority of law, and it was clearly competent for the commissioner to cancel and set it aside. It is argued for plaintiff, under section 383 of the Code, his duplicate receipt is proof of title against all but the holder of the actual patent, which is not in the hands of the defendant. This is a rule of evidence prescribed by the Code, and is applicable in a controversy between citizens where the duplicate receipt is held with the concurrence of the United States authorities. The title to the public lands belongs to the United States, and congress is given full authority to dispose of the lands, and to make all needful rules and regulations respecting the same. Section 3, art. 4, Const. U. S. The land department has been created by congress, and rules prescribed for the disposal of the public lands; and to the officers of that department the duty of selling and disposing of the lands is committed. They can only

sell or dispose of those lands in the manner prescribed by congress. In disposing of them, there are doubtless many mistakes made; but the matter is within the control of the land department until the patent issues, and the mistakes may be corrected by the officers of that department. The entry of the plaintiff, having been made without authority, was rightfully canceled and set aside by the commissioner, and the effect of the duplicate receipt as evidence of title was destroyed. It being within the scope of the duties of the commissioner to make the correction and cancel the erroneous entry, it will be presumed, in the absence of evidence to the contrary, that it was done in accordance with the rules governing such action, and upon sufficient evidence. His action left the whole matter before the land department of the government for adjustment, where the rights of the parties could be further contested, and an appeal from the decision of the commissioner could be taken to the secretary of the interior. Whatever may be the *status* of the controversy between the parties there, it is plain, from the evidence in the record here, that the plaintiff was not entitled to recover."

In Washington Territory, in *Hays* v. *Barker*, 3 Pac. Rep. 901, the action was ejectment, and the defendant was not allowed to prove that the certificate relied upon to maintain plaintiff's action had been canceled. This the supreme court held was error, and also announced the doctrine, contained in the decisions of the supreme court of the United States, "that it appeared from the record of the case that proceedings were then pending before the land department, and that the courts would not take jurisdiction of the case until the matter was finally terminated by the issue of the patent," and judgment was reversed.

In *Forbes* v. *Driscoll*, 31 N. W. Rep. 633, this court held that it would not interfere to determine questions which involve the pre-emption right between settlers; that congress has established a tribunal to decide all questions of fact that arise in determining to whom the government will sell or dispose of its land; and that, prior to the issuing of the patent, the courts will not

interfere to review its acts, or prejudge the correctness of its rulings.   The case was one in which Forbes had entered upon a quarter section of public land, filed his declaratory statement at the Deadwood land-office, and had made some improvements, but had subsequently abandoned the land, as claimed by Driscoll, who thereupon filed his declaratory statement, entered upon a part of the same quarter section outside of the inclosure and improvements of Forbes, and erected a dwelling-house, broke up a portion of the land, and resided thereon, and made it his home.   Forbes brought a possessory action, under the statute, to eject Driscoll from the entire quarter section, and recovered judgment in the court below; but the supreme court reversed the case, holding that while the action might have been maintained, under the statute, by Forbes, to obtain such portion of the premises as had been inclosed and cultivated by him, and from which he had been ousted by Driscoll, if such were the fact, yet, Driscoll having entered, and made improvements upon that portion of the land which was unoccupied and unimproved, the judgment ousting him therefrom was in excess of the court's jurisdiction, a determination of mere pre-emption rights, and therefore void.   And, in rendering its decision, the court·makes use of the following pertinent language : "From these decisions of the supreme court it would seem to be settled that courts of law can in no case review the action of the land department, after it has acted, by declaring, in effect, its acts illegal and void; and that courts of equity are powerless to act until the jurisdiction of the department has ceased by the issue of the patent; and that, when the jurisdiction of the court of equity is invoked, the error complained of must come clearly within the well-known grounds of equity jurisdiction.    *    *    *    A contrary view of the law would bring the courts and land-offices into constant collision.   A decision of the courts in advance would take from these offices the jurisdiction the law has given them to hear and determine 'all rights of pre-emption arising between different settlers.'   It would bring into the courts for decision all claims and contests before the department, and the absurd

result would be reached, as we are informed by briefs of counsel has in fact resulted in this case, to-wit, that the plaintiff, Forbes, has judgment in the district court of the territory awarding him the possession of the entire quarter section, while the defendant, Driscoll, has the decision of the land department, entered since the trial of this case, awarding him the patent, and consequent right to the possession, of the same premises."

We have examined Judge DEADY's opinion in *Smith* v. *Ewing*, 23 Fed. Rep. 741, in which he arrives at a different conclusion from that reached by us; and, in so far as the opinion denies the authority of the commissioner, under the direction of the secretary of the interior, to cancel the final receipt once issued, the decision stands alone, and is unsupported by the authorities cited by the learned judge.

The power of supervision given the secretary and commissioner is a general one,—a supervision over all the acts of the register and receiver. There is no exception made in the matter of the issuing of final certificates; and if the position here contended for be the correct one, to-wit, that the commissioner must issue a patent at once upon the presentation of the certificate, and that the issue of the certificate concludes all inquiry into matters settled by its issue, then it concludes all supervision by the superior officers; and on that reasoning the patent might as well issue by the local as by the supervisory officers. We are led to adopt the contrary of this reasoning. In our judgment, the secretary of the interior, and, "under his direction," the commissioner of the general land-office, is "charged with the supervision of the public lands" for the very purpose of preventing frauds, mistakes, and errors in the disposition of such lands by the local officers; and when such officers have committed errors or mistakes, or have been imposed upon by fraud, the entire case may be re-examined upon appeal, or so far supervised, in the usual course of transmission through the department, as to expose and correct such errors or frauds, to the end that the patent may issue to the pre-emptor honestly entitled to it under the law. Any other rule would make the "right of pre-emp-

tion, arising between different settlers," to be determined by
the courts, instead of the register and receiver, as provided by
statute, in a large class of pre-emption cases.  It is no answer
to say that fraud is a question for the courts, that its determina-
tion is judicial in its character, and that such power cannot be
exercised by the executive department.  The determination of
"the right of pre-emption arising between different settlers," and
the weighing and considering testimony as to settlement, etc.,
upon which such right depends, is essentially judicial in its
character; yet no one doubts the right of congress to confer
such powers upon a branch of the executive department.  *No
private rights* intervene so long as the title, legal and equitable,
remain in the government, or while such title may be held as
derived from the government through fraud or mistake; and the
department in these cases only pass upon the questions of fraud
or mistake so far as to determine whether it—the department—
will re-examine or reopen the case already determined.  It does
not seek to adjudicate upon the fraud or mistake, alleged as
such, between *private parties.*  The case made is a *prima facie*
one in practice,—a petition for a review of the former decision,
upon *ex parte* showing of fraud or mistake as against the *gov-
ernment;* and while the case is pending in the department, and
before patent issues, the secretary, and, under his direction, the
commissioner, ought to have, and, in our judgment, they clearly
have, such power of re-examination and readjudication in a
proper way, under the pre-exemption act of 1841 and the amend-
ments thereto.  We are clearly of the opinion that the super-
visory and appellate powers vested in the secretary of the inte-
rior, and the commissioner of the general land-office under his
direction, give them the right to examine all acts of the register
and receiver.  In matters of fact left to the determination of the
local officers, the jurisdiction of the secretary and commissioner
may be exercised by appeal and a re-examination of the facts
themselves, or by examination of their action, and requiring
them again to examine the question of fact involved; and in all

cases they may *supervise* the purely administrative or executive acts of the local officers.

We are led, then, to the conclusion that, prior to the issuance of the patent, the plaintiff cannot maintain this action. This court cannot know but that the department may issue to him, instead of the defendant, a patent for the premises in contro-versy; and if his claim is just and right, (a question upon which this court does not pass,) the law presumes he will obtain a patent, upon the ground that all officers are presumed to act justly, and to do their duty.

In this opinion we have studiously avoided intimating what may be the rights of the plaintiff under any other form of action. It is sufficient for this case that this action cannot be maintained, for the reasons given. The judgment must be reversed, and the case remanded, with instructions to dismiss the complaint.

All the justices concur.