YU, J.
¶ 1 This case concerns the latest constitutional challenge to charter schools in our state. In 2015, this court held the charter *1146 school system created by Initiative 1240 (I-1240) (Charter School Act or Act) was unconstitutional primarily due to the funding structure. League of Women Voters of Wash. v . State, 184 Wash.2d 393, 413, 355 P.3d 1131 (2015). The following year, the legislature adopted a modified version of the Charter School Act that attempted to cure its constitutional deficiencies. LAWS OF 2016, ch. 241.
¶ 2 At the outset, we are aware of the deep-seated conflicting opinions regarding charter schools. While each side of the discussion may have legitimate points of view, it is not the province of this court to express favor or disfavor of the legislature's policy decision to create charter schools. Rather, our limited role is to determine whether the enacted legislation complies with the requirements of our state constitution. We conclude that its only unconstitutional provision is severable, and thus we affirm the trial court in part and hold that the remainder of the Charter School Act is constitutional on its face.
FACTUAL AND PROCEDURAL BACKGROUND
¶ 3 In 2012, Washington voters approved I-1240, codified at chapter 28A.710 RCW, which created a public charter school system. LAWS OF 2013, ch. 2. In League of Women Voters, this court held that I-1240 violated article IX, section 2 of the Washington Constitution. 184 Wash.2d at 413, 355 P.3d 1131. We concluded that I-1240 incorrectly designated charter schools as common schools and then impermissibly supported them with money allocated for common schools. Id. at 406-07, 355 P.3d 1131. Because the unconstitutional provisions of I-1240 were not severable, the court did not reach the other challenges raised by the plaintiffs. Id. at 413, 355 P.3d 1131.
¶ 4 In 2016, the legislature enacted the Charter School Act with amendments designed to cure its constitutional defects. LAWS OF 2016, ch. 241. The Act provides for the establishment of up to 40 charter schools, which are designated as public schools that are open to all children for free "as an alternative to traditional common schools." RCW 28A.710.150(1), .020(1)(b).
¶ 5 Plaintiffs[1] brought suit in King County Superior Court, seeking a declaratory judgment that the Act is facially unconstitutional. A number of charter school supporters joined the suit as intervenor-respondents.[2] On cross motions for summary judgment, the trial court concluded that the Act did not on its face violate the Washington Constitution.[3] Clerk's Papers (CP) at 3744-69. Plaintiffs sought direct review from this court pursuant to RAP 4.2(a), and we granted review. We accepted seven amicus briefs supporting the State and intervenor-respondents.
ISSUES[4]
A. Whether the Act violates article IX, section 2 's "general and uniform" requirement?
B. Whether the Act violates article III, section 22 by delegating the superintendent's supervisory role to the charter school commission?
*1147 C. Whether the Act violates article IX, section 2 by diverting restricted state funds to support charter schools?
D. Whether the Act violates article II, section 37 by revising the state collective bargaining laws and the Basic Education Act of 1977, RCW 28A.150.200, without setting forth those revisions and amendments in full?
ANALYSIS
¶ 6 The Charter School Act represents a policy choice by the legislature to make charter schools available to Washington students. We have previously recognized that the legislature "provide[s] the best forum for addressing the difficult policy questions inherent in forming the details of an education system." McCleary v . State , 173 Wash.2d 477, 517, 269 P.3d 227 (2012). While the appellants may disagree with the legislature's policy decision in this instance, our review is limited to whether the Act violates the state constitution.
¶ 7 This case involves issues of statutory construction and constitutional questions, and thus the standard of review is de novo. City of Redmond v . Moore, 151 Wash.2d 664, 668, 91 P.3d 875 (2004). We look at the issues as if for the first time and therefore show no deference to the trial court's decision.
A. The Act does not violate article IX, section 2 's general and uniform system of public schools
¶ 8 Article IX, section 2 of the Washington Constitution sets the framework for the state's public school system. It states in relevant part:
The legislature shall provide for a general and uniform system of public schools. The public school system shall include common schools, and such high schools, normal schools, and technical schools as may hereafter be established.
CONST . art. IX, § 2. Accordingly, the constitution requires the legislature to provide a general and uniform system of public schools that includes common schools. However, as we have previously held, the system is not limited to common schools because "art. [IX], § 2 provides for something considerably more extensive." Seattle Sch. Dist. No. 1 v . State, 90 Wash.2d 476, 522, 585 P.2d 71 (1978). It also authorizes, but does not require, the legislature to create non-common-schools, such as high schools, normal schools,[5] or technical schools. At issue in this case is whether this provision in article IX, section 2 places any restrictions on the legislature's power to create non-common-schools.
¶ 9 Appellants argue this constitutional provision has two relevant limitations that the Act violates. First, they claim article IX, section 2 empowers the legislature to create only non-common public schools similar to those enumerated in the provision (high schools, normal schools, or technical schools). Because charter schools are not similar to the type of schools on the list, appellants reason the legislature does not have the authority to establish them. Second, appellants contend even if article IX, section 2 does not impose restrictions on the type of schools the legislature can create, it nevertheless requires that every school conform to the requirements of the "general and uniform system of public schools." Appellants argue charter schools do not.
1. Article IX, section 2 does not limit the legislature's authority to create non-common-schools
¶ 10 Appellants do not argue that article IX, section 2 contains an exhaustive list of all the non-common-schools the legislature may create, nor is there any limiting language in the provision to support such an interpretation. However, appellants do argue that high schools, normal schools, and technical schools represent the type of non-common-schools that the legislature can create. Appellants reason that at the time the constitution was written, these schools served a specialized population or taught a specialized educational program. Accordingly, appellants ask us to interpret article IX, section 2 as conferring to the legislature the power to create only specialized non-common-schools.
*1148 ¶ 11 We have never interpreted article IX, section 2 to limit the legislature's ability to create non-common-schools. In one of our earliest cases interpreting the provision, this court endorsed the power of the legislature to create a non-common-school that did not serve a specialized student population or teach a specialized curriculum. Sch. Dist. No. 20 v . Bryan, 51 Wash. 498, 506, 99 P. 28 (1909). Legislation passed shortly after statehood established a model training school embedded in each normal school. Senior teachers-in-training at the normal school acquired "actual practice" teaching students sent from the nearby common school. LAWS OF 1893, ch. 107, § 12. Though a model school could refuse to accept students "by reason of incorrigibility, or mental defects," enrollment was not otherwise limited to a specialized population. LAWS OF 1907, ch. 97, § 2.
¶ 12 While this court determined the legislation was unconstitutional, its decision rested on the schools' funding source and not their program of education or student body. Bryan, 51 Wash. at 506, 99 P. 28. These model training schools were unconstitutional because the legislature improperly designated them as common schools and funded them with constitutionally protected common school money. But the court was careful to note, "It is not that the legislature cannot make provision for the support of a model training school, but in its attempt to do so, it has made provision for it out of the wrong fund." Id. Therefore, Bryan supports the conclusion that article IX, section 2 does not prevent the legislature from creating non-common-schools that are not specialized so long as they do not use funds allocated for common schools.
¶ 13 Appellants argue that Bryan is only one of many decisions where this court has struck down legislation supporting non-common-schools. But, just as in Bryan, the court's decisions have always turned on the legislature's improper use of common school money. State ex rel. State Bd. for Vocational Educ. v . Yelle, 199 Wash. 312, 316-17, 91 P.2d 573 (1939) (vocational rehabilitation of disabled persons cannot be paid for by the common school fund); Mitchell v . Consol. Sch.Dist. No. 201, 17 Wash.2d 61, 66, 135 P.2d 79 (1943) (plurality opinion) (students attending private and parochial schools cannot use public school transportation paid for by the common school fund); League of Women Voters, 184 Wash.2d at 413, 355 P.3d 1131 (charter schools are not common schools and cannot use common school funds). None of these cases stand for the proposition that non-common-schools can provide only specialized educational opportunities.
¶ 14 In sum, article IX, section 2 does not restrict the legislature's ability to create non-common-schools that provide a general education and are open to all students.[6]
2. The Act complies with the general and uniform system of public schools
¶ 15 When the legislature exercises its authority to create a non-common-school then the school must conform to the requirements of the "general and uniform system of public schools." CONST . art. IX, § 2. We most recently described this system in Federal Way School District No. 210 v . State :
"A general and uniform system, we think, is, at the present time, one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the 12th grade-a system administered with that degree of uniformity which enables a child to transfer from one district to another within the same grade without substantial loss of credit or standing and with access by each student of whatever grade to acquire those skills and training that are reasonably understood *1149 to be fundamental and basic to a sound education."
167 Wash.2d 514, 524, 219 P.3d 941 (2009) (quoting Northshore Sch. Dist. No. 417 v . Kinnear, 84 Wash.2d 685, 729, 530 P.2d 178 (1974) (plurality opinion), overruled on other grounds by Seattle Sch. Dist. No. 1, 90 Wash.2d at 514, 585 P.2d 71 ).
¶ 16 Based on this definition, we held that the Basic Education Act (BEA), which provides (1) uniform educational content, (2) teacher certification, (3) minimum instructional hour requirements, and (4) a "statewide assessment system enabling students to transfer from one school district to another without loss of credit and with access to substantially the same educational opportunities," satisfies the general and uniform system of public schools mandated by article IX, section 2. Id. at 524-25, 219 P.3d 941.
i. The Act is sufficiently similar to the BEA in relevant parts to satisfy uniformity
¶ 17 The Act is sufficiently similar to the BEA in pertinent parts, and a comparison of the two shows this similarity. First, charter schools provide the same uniform educational content as the BEA because they provide the same instructional program of basic education. Id. The Act states that charter schools must "[p]rovide a program of basic education" that includes (1) the goals codified at RCW 28A.50.210, which aim to ensure that schools provide all students the opportunity to obtain knowledge and skills essential to their success,[7] (2) instruction in the essential academic learning requirements (EALRs), which are developed by the superintendent of public instruction and "identify the knowledge and skills all public school students need to know and be able to do," RCW 28A.655.070(1), and (3) the statewide student assessment, which is developed by the superintendent and assesses students' mastery of the EALRs in the areas of reading, writing, mathematics, and science. RCW 28A.710.040(2)(b).
¶ 18 While the Act does not define "program of basic education," the legislature expressly directs us to construe Title 28A RCW "in pari materia even though as a matter of prior legislative history they were not originally enacted in the same statute." RCW 28A.900.040. Therefore, we consult the definition of "program of basic education" found in the BEA and applicable to common schools. RCW 28A.150.203(9). " 'Program of basic education' means the overall program under RCW 28A.150.200 and deemed by the legislature to comply with the requirements of Article IX, section 1 of the state Constitution." Id. RCW 28A.150.200(2)(a), in turn, states that the "minimum components" for the instructional program of basic education are outlined in RCW 28A.150.220. The components are:
(a) Instruction in the [EALRs] under RCW 28A.655.070 ;
(b) Instruction that provides students the opportunity to complete twenty-four credits for high school graduation, beginning with the graduating class of 2019 or as otherwise provided in RCW 28A.230.090. Course distribution requirements may be established by the state board of education under RCW 28A.230.090 ;
(c) If the essential academic learning requirements include a requirement of languages other than English, the requirement may be met by students receiving instruction in one or more American Indian languages;
(d) Supplemental instruction and services for students who are not meeting academic standards through the learning *1150 assistance program under RCW 28A.165.005 through 28A.165.065 ;
(e) Supplemental instruction and services for eligible and enrolled students and exited students whose primary language is other than English through the transitional bilingual instruction program under RCW 28A.180.010 through 28A.180.080 ;
(f) The opportunity for an appropriate education at public expense as defined by RCW 28A.155.020 for all eligible students with disabilities as defined in RCW 28A.155.020 ; and
(g) Programs for highly capable students under RCW 28A.185.010 through 28A.185.030.
RCW 28A.150.220(3).[8] In sum, charter schools, just like common schools, provide the instructional program of basic education in the BEA.[9]
¶ 19 Just as the BEA does for common schools, the Act requires charter schools to employ certified teachers with limited exceptions that also apply to common schools. RGW 28A.710.040(2)(c). Charter schools also must provide the same minimum instructional hours as common schools as mandated by the program of basic education.[10] RCW 28A.150.220(2).
¶ 20 Finally, just like the BEA, the Act requires charter schools to participate in the statewide assessment, and nothing in the Act's plain language inhibits students' ability to transfer between schools. RCW 28A.710.040(2)(b). We are unpersuaded by appellants' claim that students who transfer into charter schools from other public schools may lose credits. Br. of Appellants at 29. The Act states that other public schools must honor credits earned "in the charter school[s] in the same manner and according to the same criteria that credits are accepted from other public schools." RCW 28A.710.060(2). While the Act is silent on how credits are calculated when a student enters a charter school, no provision of the Act indicates charter schools will not honor credits earned elsewhere. Accordingly, the Act does not on its face break the uniformity requirement by interfering with students' ability " 'to transfer from one district to another within the same grade without substantial loss of credit or standing.' " Fed. Way Sch. Dist. No. 210, 167 Wash.2d at 524, 219 P.3d 941 (quoting Northshore Sch. Dist. No. 417, 84 Wash.2d at 729, 530 P.2d 178 ).
¶ 21 Justice Madsen's dissent does not dispute that charter schools provide the same program of basic education, employ certified teachers, meet the minimum instructional hours, and participate in the statewide assessment. The dissent nevertheless concludes without evidence that charter schools violate uniformity because they "frustrate a student's access to standardized educational opportunities and his or her ability to freely transfer to other schools without negative impact." Dissent (Madsen, J.) at 1161. In essence, the dissent would hold that all public schools must be identical to common schools in order to satisfy uniformity. There is no support for such a sweeping assertion. Neither the constitution nor our precedent require non-common-schools to be indistinguishable from common schools, and *1151 adopting the dissent's position would greatly limit the legislature's ability to innovate.
¶ 22 In sum, charter schools are not rendered unconstitutional just because they do not operate identically to common schools. The Act on its face satisfies the general and uniform system of public schools because, in relevant parts, it is sufficiently similar to the BEA, which we have already held satisfies article IX, section 2.
ii. Non-common-schools are not required to have locally elected school boards
¶ 23 As described above, charter schools satisfy the general and uniform system as defined in Federal Way School District No. 210 , but we address an argument raised by appellants and Justice Madsen's dissent regarding local voter control. Both appellants and Justice Madsen's dissent argue the Act violates article IX, section 2 because, unlike common schools, charter schools are not run by locally elected school boards. This argument attempts to extend the local voter control requirement that applies to common schools to all public schools, but the public school system "is neither limited to common schools nor is it synonymous therewith." Seattle Sch. Dist. No. 1, 90 Wash.2d at 522, 585 P.2d 71. Therefore, while Bryan established that local voter control "is a most important feature" of common schools, we have never said it is a constitutional requirement that applies to all schools in the general and uniform system of public schools. Bryan , 51 Wash. at 504, 99 P. 28.
¶ 24 Justice Madsen's dissent concedes that Bryan's discussion of local voter control is limited to common schools, but it nevertheless argues that local voter control is "an established core characteristic" of the general and uniform system. Dissent (Madsen, J.) at 1160. This conclusion is not supported by precedent or history. As previously discussed, the court in Bryan determined the model schools were unconstitutional-not because of their governance structure, but because they were improperly funded using common school money. The court did not declare that model schools must have locally elected school boards but, instead, noted that all such "experiments in education must be indulged, if at all," using non-constitutionally-protected funds. Bryan, 51 Wash. at 505, 99 P. 28. Therefore, Bryan does not suggest that local voter control is an essential element of the general and uniform system of public schools.
¶ 25 There are also numerous examples of non-common-schools without locally elected school boards that date back to this state's founding. The first normal schools, a type of non-common-school expressly recognized in article IX, section 2, were established the year after the constitution was written. LAWS OF 1890, § 1, at 278, § 1, at 281. They were governed by separate unelected boards of trustees. Id. § 4, at 278, § 3, at 282. Today, the State and intervenor-respondents also identify many non-common-schools that are not subject to local voter control. Br. of Resp't State of Wash. at 33; Intervenor-Resp'ts' Br. at 6-7.
¶ 26 It also makes sense that charter schools are not required to have locally elected school boards because of their funding source. Unlike common schools, charter schools receive no local levy money. Therefore, they do not raise the same concerns as common schools about local control over locally raised tax dollars.
¶ 27 In sum, the Act does not violate article IX, section 2 due to lack of a locally elected school board because the constitution does not require it.
B. The Act does not violate article III, section 22 by delegating the superintendent's supervisory role to the Washington State Charter School Commission
¶ 28 Article III, section 22 provides, "The superintendent of public instruction shall have supervision over all matters pertaining to public schools, and shall perform such specific duties as may be prescribed by law." Appellants and Justice Wiggins' dissent argue the Act divests the superintendent of his supervisory power over charter schools because it creates the Washington State Charter School Commission (Commission).
¶ 29 The Commission is an independent state agency with the authority to authorize charter schools anywhere in the state.
*1152 RCW 28A.710.070(1).[11] The Commission reviews charter school applications according to nationally recognized procedures, practices, and criteria. RCW 28A.710.140. If the Commission grants an application, it executes a contract with the school that sets academic and operational expectations with metrics such as student achievement, the school's financial performance, and its compliance with its contract and all laws. RCW 28A.710.160(2), .170(2).
¶ 30 The Commission is also charged with "continually monitor[ing] the performance and legal compliance" of the schools it authorizes "to ensure the highest standards of accountability and oversight for these schools." RCW 28A.710.180(1), .070(1). If the Commission determines that a school is not complying with its legal obligations, then it can impose sanctions or revoke the school's contract. RCW 28A.710.180(3) - (4). It cannot renew a school's contract if the school performs in the bottom quartile on the student achievement index, absent exceptional circumstances. RCW 28A.710.200(2). In essence, the Commission functions like a school district board that monitors the performance and operation of its schools.
¶ 31 The superintendent of public instruction is an integral part of the Commission. The superintendent is one of the Commission's 11 members and is joined by the chair of the state board of education and 9 members appointed by the governor, senate, and the house of representatives. RCW 28A.710.070(3). The Commission is also housed at the office of the superintendent for administrative purposes. RCW 28A.710.070(8). Despite the superintendent's critical role on the Commission, the issue raised by appellants and Justice Wiggins' dissent is whether the Commission interferes with the superintendent's constitutional duty to supervise all public schools because the Commission oversees the schools it authorizes. CONST . art. III, § 22.
¶ 32 While there is no relevant precedent from this court interpreting article III, section 22, we have interpreted what the term "supervision" means in other contexts. In Great Northern Railway Co. v . Snohomish County, this court was asked to interpret the term "general supervision ," which appeared in a statute giving the state board of tax commissioners general supervision over assessors and county boards of equalization. 48 Wash. 478, 483, 93 P. 924 (1908). Supervision, the court determined, requires " 'the power to review all the acts of the local officers, and to correct, or direct a correction of, any errors committed by them. Any less power than this would make the "supervision" an idle act, -a mere overlooking without power of correction or suggestion.' " Id. at 484, 93 P. 924 (quoting Vantongeren v . Heffernan, 5 Dakota 180, 38 N.W. 52, 56 (1888) ).
¶ 33 This court later applied that definition of general supervision to the superintendent of public instruction's supervisory powers as codified by the school code. State ex rel. Sch. Dist. No. 301 v . Preston, 84 Wash. 79, 86, 146 P. 175 (1915). The court concluded that the superintendent's supervision meant "something more than the power merely to confer with and advise, or to receive reports, or file papers. In other words, that the power of supervision is not granted to an officer as a mere formality." Id. at 86-87, 146 P. 175.
¶ 34 While we have not applied our interpretation of the term supervision to article III, section 22, the attorney general has, and we consider official opinions persuasive authority. Everett Concrete Prods., Inc. v . Dep't of Labor & Indus., 109 Wash.2d 819, 828, 748 P.2d 1112 (1988) ; see 1975 Op. Att'y Gen. 1, at 8. The attorney general notes that the legislature "is quite free to shape the state's education system as it may choose, and to define the Superintendent's role within that system" so long as it respects the superintendent's supervisory role. 1998 Op. Att'y Gen. No. 6, at 4. Accordingly, the attorney general determined the legislature may delegate administration of a program of basic education to an agency or institution so long as the superintendent retains supervision and is not made subordinate to any other agency.
*1153 2009 Op. Att'y Gen. No. 8, at 15 (citing 1998 Op. Att'y Gen. No. 6, at 4).
¶ 35 Therefore, considering our case law and the opinions of the attorney general, there is no article III, section 22 violation so long as the Commission does not interfere with the superintendent's power to take corrective action and so long as the superintendent is not made subordinate to the Commission.
¶ 36 The Act expressly recognizes the superintendent's supervisory duty when it states, "Charter schools are subject to the supervision of the superintendent of public instruction and the state board of education, including accountability measures, to the same extent as other public schools, except as otherwise provided in this chapter." RCW 28A.710.040(5). There is nothing in chapter 28A.710 RCW that qualifies or diminishes the superintendent's powers.
¶ 37 The Commission does not interfere with the superintendent's statutory duties. For example, the superintendent develops and revises the EALRs that are a mandatory component of the program of basic education used in charter schools and common schools. RCW 28A.655.070(1). The superintendent manages teacher certification, and charter schools must employ certified teachers. RCW 28A.410.010(2) ; RCW 28A.710.040(2)(d). The superintendent develops the statewide student assessment, which charter schools must complete. RCW 28A.655.070(3)(a). Finally, the superintendent reports on the management and improvement of all public schools, which includes charter schools. RCW 28A.300.040(2). The Commission does not play a role in the superintendent's execution of any of these codified duties.
¶ 38 Nor does the Commission divest the superintendent of financial control over Commission-authorized charter schools. Appellants place great weight on language in the Act that states the superintendent "shall distribute state funding to charter schools." RCW 28A.710.220(2). Appellants allege this mandate means the superintendent can never withhold funds.[12] However, nothing in this statutory language points to any interference by the Commission in how funding is distributed. There are also similar statutory provisions applicable to both common schools and non-common-schools, and there is no indication that they prevent the superintendent from withholding funds when necessary. RCW 28A.510.250(1) (the superintendent "shall apportion from the state general fund" money for common schools (emphasis added) ); RCW 28A.715.040(2) (funding for tribal compact schools "shall be apportioned by the superintendent of public instruction" (emphasis added) ).[13]
¶ 39 Justice Wiggins' dissent infers a constitutional violation because each statutory provision assigning duties to the Commission does not also explicitly state that the superintendent still maintains his or her constitutional supervisory authority. The dissent then concludes that any power given to the Commission necessarily takes supervisory power away from the superintendent. Nothing in the Act requires this interpretation. The Act gives the Commission enumerated *1154 powers, but it does not disturb the superintendent's supervision.
¶ 40 It would be absurd to require that every statute that gives power to an individual or entity also include a recitation of the superintendent's inherent, constitutionally granted supervisory authority. Statutes related to common schools' boards of directors do not include such a disclaimer. For example, RCW 28A. 150.230 outlines the responsibilities of common school boards of directors. Boards supervise various aspects of the districts, including adopting policies that "establish performance criteria and an evaluation process for its superintendent, classified staff, certificated personnel, including administrative staff, and for all programs constituting a part of such district's curriculum." RCW 28A.150.230(2)(a). Boards are similarly charged with adopting policies to establish final curriculum standards and to evaluate teaching materials. Id. at (2)(f)-(g). Nowhere in the statute does it declare that the powers given to the school board are limited by article III, section 22. Just as it is unnecessary to reiterate the superintendent's power over school boards, it is unnecessary to reiterate the superintendent's power over the Commission.
¶ 41 In sum, we hold that on its face the Act does not violate article III, section 22. There is nothing in the Act that interferes with the superintendent's supervisory duty, and so we conclude that the superintendent supervises charter schools in the same manner as all other public schools. The phrase "except as otherwise provided" appears to open the door to qualify or diminish the superintendent's power, but any such amendment risks jeopardizing the Act's constitutionality. RCW 28A.710.040(5). Were the Commission to interfere with the superintendent's supervisory authority, as feared by Justice Wiggins' dissent, an as-applied challenge would be appropriate.
C. The Act does not violate article IX, section 2 by diverting restricted common school funds to support charter schools
¶ 42 Article IX, section 2 protects funding for common schools by requiring that "the entire revenue derived from the common school fund and the state tax for common schools shall be exclusively applied to the support of the common schools." (Emphasis added.)[14] While the constitution refers to a "common school fund," today the restricted common school money is commingled with unrestricted money in the general fund. Because "[t]here is no way to track the restricted common school funds or to ensure that these dollars are used exclusively to support the common schools," this court held non-common-schools cannot be funded out of the general fund. League of Women Voters, 184 Wash.2d at 409, 355 P.3d 1131.
¶ 43 The legislature has directed that charter schools are now to be funded by the Opportunity Pathways Account (OPA), which is funded by lottery revenue. RCW 28A.710.270 ; RCW 28B.76.526. It is undisputed that the OPA is the sole funding source for charter schools, and it contains no money from the general fund. CP at 2310, 2312.
¶ 44 Appellants allege that the Act, "[a]lbeit [i]ndirectly," diverts restricted common schools funds to charter schools. Br. of Appellants at 32 (underlining omitted). Appellants first argue that charter schools' costs are increasing and they will exhaust the OPA, forcing the legislature to use the general fund to pay for charter schools. Alternatively, appellants contend that as more charter schools are established, costs will rise and they will use a greater portion of the OPA, which also supports education scholarships and early education programming. RCW 28B.76.526. Appellants then reason the legislature will use the general fund to supplement funding for non-charter-school programs that currently rely on the OPA, though there is no authority for why the legislature is prohibited from doing so.[15]
*1155 ¶ 45 Our inquiry ends with the Act's plain language because charter schools are funded exclusively by the OPA and therefore receive no money from the general fund. Appellants only speculate that the legislature will use an improper funding source if and when it exhausts the OPA, but this is better reserved for an as-applied challenge. Therefore, we hold that the Act does not on its face violate article IX, section 2 by diverting restricted common school money to charter schools.
D. The provision of the Act that violates article II, section 37 is severable
¶ 46 Article II, section 37 provides, "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." Appellants argue the Act violates this constitutional provision because it changes the collective bargaining rights of charter school employees without fully setting forth those revisions.[16] Appellants allege existing laws give all public school employees the right to organize across schools within a school district. They contend the Act amends without reference these existing laws to restrict the rights of charter school employees.
¶ 47 Appellants' challenge concerns two of the state's collective bargaining laws, chapters 41.59 and 41.56 RCW. Chapter 41.59 RCW gives certified school district employees "the right to self-organization, to form, join, or assist employee organizations, [and] to bargain collectively." RCW 41.59.060(1). Chapter 41.56 RCW applies broadly to public employees but excludes those covered by other collective bargaining laws like chapter 41.59 RCW. RCW 41.56.020. Its purpose is to "provid[e] a uniform basis for implementing the right of public employees to join labor organizations of their own choosing and to be represented by such organizations in matters concerning their employment relations with public employers." RCW 41.56.010. Both chapters outline the process for how collective bargaining units are determined. RCW 41.59.080 ; RCW 41.56.060.
¶ 48 The Act adds a nearly identical section to chapters 41.59 and 41.56 RCW. RCW 41.59.031 ; RCW 41.56.0251. In relevant part, the new provision provides:
This chapter applies to any charter school established under chapter 28A.710 RCW. Any bargaining unit or units established at the charter school must be limited to employees working in the charter school and must be separate from other bargaining units in school districts, educational service districts, or institutions of higher education. Any charter school established under chapter 28A.710 RCW is a separate employer from any school district, including the school district in which it is located.
RCW 41.59.031 ; RCW 41.56.0251. While the Act expressly applies chapters 41.59 and 41.56 RCW to charter schools, it significantly limits the bargaining right of charter school employees by restricting their bargaining units to individual charter schools. The Act does not reference any other existing collective bargaining laws, including the statutes that direct how bargaining units are determined. See RCW 41.59.080 ; RCW 41.56.060. The issue is whether the legislature violated article II, section 37 when it limited the bargaining units of charter school employees to individual schools but did not lay out in full or reference any other existing collective bargaining laws.
¶ 49 We use a two-part test to evaluate an article II, section 37 challenge because while " '[n]early every legislative act of a general nature changes or modifies some existing statute, either directly or by implication,' " that does not necessarily mean that the legislation is unconstitutional. Citizens for Responsible Wildlife Mgmt. v . State, 149 Wash.2d 622, 640, 71 P.3d 644 (2003) (quoting Holzman v . City of Spokane, 91 Wash. 418, 426, 157 P. 1086 (1916) ). First, we consider *1156 whether " 'the new enactment [is] such a complete act that the scope of the rights or duties created or affected by the legislative action can be determined without referring to any other statute or enactment.' " State v . Manussier, 129 Wash.2d 652, 663, 921 P.2d 473 (1996) (quoting Wash. Educ. Ass'n v . State, 97 Wash.2d 899, 903, 652 P.2d 1347 (1982) ). The purpose of this part of the test is to make sure the effect of new legislation is clear and to " 'avoid[ ] confusion, ambiguity, and uncertainty in the statutory law through the existence of separate and disconnected legislative provisions, original and amendatory, scattered through different volumes or different portions of the same volume.' " Amalg. Transit Union Local 587 v . State, 142 Wash.2d 183, 245, 11 P.3d 762 (2000) (quoting Flanders v . Morris, 88 Wash.2d 183, 189, 558 P.2d 769 (1977) ).
¶ 50 Turning to the second part of the test, we ask whether " 'a straightforward determination of the scope of rights or duties under the existing statutes [would] be rendered erroneous by the new enactment.' " Manussier, 129 Wash.2d at 663, 921 P.2d 473 (quoting Wash. Educ. Ass'n, 97 Wash.2d at 903, 652 P.2d 1347 ). If the answer is no, the legislation does not violate article II, section 37. This prong of the test ensures that the legislature is aware of the legislation's impact on existing laws. Amalg. Transit, 142 Wash.2d at 246, 11 P.3d 762.
¶ 51 The Act satisfies the first part of the test because it is complete. The rights of charter school employees are "readily ascertainable from the words of the statute alone." Citizens for Responsible Wildlife Mgmt., 149 Wash.2d at 642, 71 P.3d 644. It does not matter that the Act defines bargaining units for charter school employees differently than for other public school employees because the rights of charter school employees can be understood by reading only the Act.
¶ 52 The answer to the second part of the test is more difficult to determine. To understand whether the Act alters any existing rights, we separately analyze the existing collective bargaining rights pursuant to chapters 41.59 and 41.56 RCW. Chapter 41.59 RCW confers collective bargaining rights to certified school district employees. RCW 41.59.020(4). But charter school employees are not school district employees. Most charter schools are authorized by the Commission and have no relationship to a school district. The employees of those authorized by school districts are also not school district employees pursuant to their charter contracts. CP at 1004. Therefore, there is no article II, section 37 violation with respect to chapter 41.59 RCW because no rights were altered; certified school district employees did not have an existing right to bargain with certified charter school employees.
¶ 53 Chapter 41.56 RCW provides collective bargaining rights to "any county or municipal corporation, or any political subdivision of the state of Washington," except those covered by other collective bargaining laws. RCW 41.56.020. Its sweeping application means public school employees, including noncertified charter school employees, have collective bargaining rights. One of those rights concerns the way that bargaining units are determined. The statute charges the Public Employment Relations Commission (PERC) with determining, modifying, or combining bargaining units after considering employees' duties, skills, and working conditions; history of collective bargaining; organization; and desires. RCW 41.56.060(1). Nothing in the statute's plain language prohibits PERC from creating a bargaining unit that includes school district and charter school employees.
¶ 54 Appellants argue the Act amends existing laws like RCW 41.56.060 because bargaining units must be individual charter schools regardless of factors like employees' duties, skills, and working conditions. But because the legislature did not lay out existing laws, appellants contend "[t]he impact of the Act's restrictions ... cannot be fully understood." Br. of Appellants at 46. Appellants rely on Washington Education Ass'n v. State , 93 Wash.2d 37, 38, 604 P.2d 950 (1980), where this court considered an appropriations bill that set limits on salary increases for certain school district employees. Existing laws empowered school districts "to spend funds, from whatever source, as they choose on teacher salaries." Id. at 41, 604 P.2d 950. The court determined that the bill *1157 was unconstitutional because it attempted to amend the school districts' power without fully setting out the existing law. Id. Similar to Washington Education Ass'n, appellants argue that while the Act purports to grant charter school employees bargaining rights, the Act actually significantly reduces their existing power.
¶ 55 In contrast, the State argues that the legislature did not amend existing laws because it "simply added charter school employees to the many sets of public employees covered by RCW 41.56." Br. of Resp't State of Wash. at 49, 604 P.2d 950. The State's argument is not well taken because noncertified charter school employees effectively had existing rights pursuant to chapter 41.56 RCW, even if the charter schools did not yet exist. The State also attempts to justify the legislature's action by arguing the legislature has made similar carve-outs for other groups of employees and separately defined their bargaining units. See, e.g., RCW 41.56.025 (restricting the bargaining units of education providers who teach juveniles detained at Department of Corrections facilities). However, our only concern is whether the legislature complied with the requirements of article II, section 37 in this instance.
¶ 56 We return to the purpose of article II, section 37, which is to ensure that " '[c]itizens or legislatures must not be required to search out amended statutes to know the law on the subject treated in a new statute.' " Wash. Citizens Action of Wash. v . State, 162 Wash.2d 142, 152, 171 P.3d 486 (2007) (quoting Wash. Ass'n of Neigh. Stores v . State, 149 Wash.2d 359, 373, 70 P.3d 920, abrogated on other grounds by Filo Foods, LLC v . City of SeaTac, 183 Wash.2d 770, 357 P.3d 1040 (2015) ). In this case, the Act produces the exact harm article II, section 37 attempts to avoid: it requires a thorough search of existing laws in order to understand the Act's effect on other provisions of chapter 41.56 RCW. After careful review, it is clear that charter school employees not covered by chapter 41.59 RCW would be covered by chapter 41.56 RCW because they are public employees. It is also clear that absent legislation restricting their rights, charter school employees' bargaining units would not be restricted to individual charter schools because bargaining unit determinations would be controlled by RCW 41.56.060. Therefore, the effect of the Act is to greatly restrict the existing bargaining rights of charter school employees without "explicitly show[ing] how [the Act] relates to statutes it amends." Id. (emphasis omitted). We hold this violates article II, section 37.
¶ 57 The next question is whether the Act's offending provision is severable. In making a severability determination, we consider
"whether the constitutional and unconstitutional provisions are so connected ... that it could not be believed that the legislature would have passed one without the other; or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature."
State v . Abrams, 163 Wash.2d 277, 285-86, 178 P.3d 1021 (2008) (alteration in original) (quoting Gerberding v . Munro, 134 Wash.2d 188, 197, 949 P.2d 1366 (1998) ).
¶ 58 As to the first requirement, we have held that when legislation includes a severability clause, it "provide[s] the necessary assurance that the Legislature would have enacted the appropriate sections of the legislation despite the unconstitutional sections." Gerberding, 134 Wash.2d at 197, 949 P.2d 1366. In this case, the legislature included a severability clause that states, "If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected." ENGROSSED SECOND SUBSTITUTE S.B. 6194, at § 305, 64th Leg., Reg. Sess. (Wash. 2016). This clause favors concluding that the legislature still would have passed the Act absent the offending provision.
¶ 59 Turning to the second requirement, the collective bargaining rights of noncertified employees are not so intertwined as to undermine the purpose of the legislation. The purpose of the Act is to authorize the creation of up to 40 charter schools over a five-year period. RCW 28A.710.150(1). This purpose *1158 is not undercut when the bargaining units of noncertified employees are not limited to individual charter schools. Our determination is also bolstered by the fact that the provision is " 'grammatically, functionally, and volitionally severable.' " Abrams, 163 Wash.2d at 287, 178 P.3d 1021 (quoting McGowan v . State, 148 Wash.2d 278, 295, 60 P.3d 67 (2002) ). It stands alone as a separate section of the Act, it is the only provision that addresses the collective bargaining rights of noncertified employees, and there is no evidence the legislature would not have passed the Act without it. We conclude it is severable.
¶ 60 In sum, we hold that the Act violates article II, section 37 by adding a provision to chapter 41.56 RCW that renders erroneous existing collective bargaining rights without reference. However, the offending provision is severable, and the remainder of the Act stands.
CONCLUSION
¶ 61 Appellants raise many challenges to the constitutionality of the Act, but we agree with only one. The Act violates article II, section 37 with respect to its revision of chapter 41.56 RCW; however, that provision is severable. Appellants have otherwise failed to carry their heavy burden to show that there is no way the remainder of the Act can be implemented in a manner that is constitutional. Therefore, we affirm the trial court in part, strike the provision that we find unconstitutional, and hold that the remainder of the Act is constitutional on its face.
WE CONCUR:
Johnson, J.
Stephens, J.
Gordon McCloud, J.
González, J. (concurring in part and dissenting in part)
¶ 62 I agree with the lead opinion's well-reasoned opinion on all points except one. I cannot join the lead opinion's conclusion that RCW 41.56.0251, as enacted, violates article II, section 37 of our state constitution.
¶ 63 I agree that the critical question is, "Would a straightforward determination of the scope of rights or duties under the existing statutes be rendered erroneous by the new enactment?" Wash. Educ. Ass'n v . State , 93 Wash.2d 37, 41, 604 P.2d 950 (1980) (citing Weyerhaeuser v . King County, 91 Wash.2d 721, 731, 592 P.2d 1108 (1979) ). I also agree that the Public Employees' Collective Bargaining Act, chapter 41.56 RCW, was affected. Under chapter 41.56 RCW, the Public Employment Relations Commission usually decides who is in which bargaining unit. RCW 41.56.060. The charter school act effectively divested the commission of that power as to charter school employees by limiting the bargaining unit to each charter school. LAWS OF 2016, ch. 241, § 137.
¶ 64 But I am not persuaded that a straightforward determination of rights and duties under chapter 41.56 RCW was rendered erroneous by the charter school act. The Public Employment Relations Commission never had authority to determine bargaining units for charter schools because they did not exist. Initiative 1240 both created charter schools and limited charter school employees' ability to organize. LAWS OF 2013, ch. 2 & § 307 (currently codified at RCW 41.56.0251 ). This was a deliberate policy choice by the drafters. The charter school act reenacted that language without change. LAWS OF 2016, ch. 241, § 137. No charter school employee has been employed in this state or been available to organize without this limitation on the books. This was a policy choice the legislature had the power to make (and, of course, to unmake). I cannot say that "a straightforward determination of the scope of rights or duties under the existing statutes [was] rendered erroneous by the new enactment" when the same act that created the new type of employee also limited their collective bargaining power. Wash. Educ. Ass'n, 93 Wash.2d at 41, 604 P.2d 950 (citing Weyerhaeuser, 91 Wash.2d at 731, 592 P.2d 1108 ). Regardless of whether it was a good policy choice, article II, section 37 is not offended.
¶ 65 I agree with the lead opinion that that the legislature would have passed the charter school act without RCW 41.59.031 and *1159 RCW 41.56.0251. Thus, I concur with the lead opinion that those provisions are severable.
¶ 66 Accordingly, I respectfully concur in part and dissent in part.
Fairhurst, C.J.

El Centro de la Raza, League of Women Voters of Washington, Washington Association of School Administrators, Washington Education Association, International Union of Operating Engineers Local 609, Aerospace Machinists Union, IAM&AW DL 751, Washington State Labor Council, AFL-CIO, United Food and Commercial Workers Union 21, Washington Federation of State Employees, American Federation of Teachers Washington, Teamsters Joint Council No. 28, Wayne Au, PhD, Pat Braman, and Donna Boyer.

There are 20 intervenor-respondents. They describe themselves as "a mixed group of charter public school students and parents; charter public schools themselves; a charter public school management organization; and a statewide nonprofit organization." Clerk's Papers (CP) at 52.

Prior to summary judgment, the trial court dismissed two of plaintiffs' claims on justiciability grounds. CP at 193-206.

Appellants also argued that the Act interferes with the State's paramount duty to amply fund education, as mandated by McCleary v . State, 173 Wash.2d 477, 269 P.3d 227 (2012). This court has since determined the State fulfilled its funding obligation, and so appellants' claim is now moot. Order, McCleary v . State, No. 84362-7, at 4 (Wash. June 7, 2018).

At statehood, normal schools provided training and certification for teachers.

The State, intervenor-respondents, and amici argue that if this court accepts appellants' argument, then it jeopardizes numerous non-common-schools or programs provided at non-common-schools. See, for example, tribal compact schools, RCW 28A.715.020 ; Running Start, RCW 28A.600.310 ; high school programming operated in community college, RCW 28B.50.533 ; "Youth Offender Program" operated by the Department of Corrections under contract with Centralia College, RCW 28A.193.020 ; CP at 2207; and online learning operated by nonprofits or private entities, RCW 28A.232.010. However, the constitutionality of these schools and programs is not before this court.

The learning goals are as follows: "(1) Read with comprehension, write effectively, and communicate successfully in a variety of ways and settings and with a variety of audiences; (2) Know and apply the core concepts and principles of mathematics; social, physical, and life sciences; civics and history, including different cultures and participation in representative government; geography; arts; and health and fitness; (3) Think analytically, logically, and creatively, and to integrate technology literacy and fluency as well as different experiences and knowledge to form reasoned judgments and solve problems; and (4) Understand the importance of work and finance and how performance, effort, and decisions directly affect future career and educational opportunities." RCW 28A.150.210.

At the time this lawsuit was filed RCW 28A.150.220(3)(d) read, "Supplemental instruction and services for underachieving students through the learning assistance program under RCW 28A.165.005 through 28A.165.065." Former RCW 28A.150.220(3)(d) (2014) (emphasis added). The legislature has since replaced "underachieving students" with "students who are not meeting academic standards." Engrossed H.B. 2242, 65th Leg., 3d Spec. Sess. (2017). Because the provision is substantively identical, we list the law as it stands today.

In addition, the State asserts that all charter school contracts require compliance with the BEA's instructional program of basic education pursuant to RCW 28A.150.200 and .220. Br. of Resp't State of Wash. at 27; see also WAC 180-19-030(4)(e).
Appellants also sought review on whether the Act unconstitutionally delegates to charter schools the authority to define the components of a program of basic education. Appellants' Statement of Grounds for Direct Review at 7. Because we hold charter schools provide the same instructional program of basic education as common schools, we do not reach appellants' delegation argument.

Declarations submitted at the trial court also indicate all charter schools meet the instructional hours required by the BEA. CP at 973-74, 1100.

A school district can also apply to be an authorizer through the Washington State Board of Education. RCW 28A.710.090. Once approved, it can authorize charter schools within its district.

The superintendent has recovered funds from a charter school. First Place Scholars Charter School was overpaid due to "some recordkeeping and reporting inadequacies by the school" and enrollment falling below initial projections. CP at 2206. The superintendent withheld a portion of its disbursements and First Place Scholars Charter School later reimbursed the superintendent the remaining overpayment. Id.

The State cites numerous WACs as evidence that the superintendent maintains financial control over charter schools. They are not critical to a facial challenge of the Act, but they highlight the superintendent's involvement in the budget process for charter schools. The superintendent reviews a charter school's adopted budget annually, including, but not limited to, "completion of data entry and edit, review of revenues and unreserved fund balances for accuracy, appropriateness of expenditures, and determination of whether or not the budget is in compliance with this chapter, state statutory law, and budget instructions issued by the superintendent of public instruction."WAC 392-123-0795. If the budget does not comply with applicable law, then the superintendent notifies the charter school board and the charter school's authorizer. WAC 392-123-080. The superintendent can impose binding restrictions on a charter school to improve its financial position if the schools is unable to balance its budget. WAC 392-123-060. If the authorizer finds the charter school has not complied with the binding restrictions, then the superintendent may withhold funds. WAC 392-123-065.

Article IX, section 3 also establishes the common school construction fund for the exclusive use of common schools.

Appellants also ask this court to take judicial notice of the latest enacted budget as evidence that the legislature is using more general fund money for other programs that also receive money from the OPA. Reply of Appellants at 23. They ask us to infer that charter schools must be the cause of any budget adjustments. Because the legislature did not use general fund money to support charter schools, we do not speculate about other legislative appropriations.

Appellants also argue that the Act violates article II, section 37 because it amends the BEA by allowing charter schools to alter components of the instructional program of basic education. Br. of Appellants at 46. Because we hold that charter schools are required to provide the instructional program of basic education in the BEA, we do not further address appellants' claim.